Argued and submitted December 10, 2012, affirmed on appeal and cross-appeal December 26, 2013, petition for review denied May 29, 2014 (355 Or 567)

Clif DAVIS
and Timothy G. Gauthier,
comprising the Oregon and Southwest Washington
IBEW-NECA Electrical Workers Audit Committee,
*Plaintiffs-Appellants
Cross-Respondents,*

*v.*

F. W. FINANCIAL SERVICES, INC.,
a Washington corporation,
*Defendant-Respondent
Cross-Appellant.*

Multnomah County Circuit Court
110404916; A149988

317 P3d 916

Michael J. Morris argued the cause for appellants-cross-respondents. With him on the briefs was Linda J. Larkin.

Joseph A. Field argued the cause for respondent-cross-appellant. On the briefs were Jonathan C. Smale and Field Jerger LLP.

Before Sercombe, Presiding Judge, and Haselton, Chief Judge, and Hadlock, Judge.

HASELTON, C. J.

**HASELTON, C. J.**

Plaintiffs Davis and Gauthier (collectively, Davis) are judgment creditors who had garnished accounts receivable of Dryer Electric, Inc. (Dryer)—accounts receivable in which F. W. Financial Services, Inc. (FWFS) held a perfected security interest. Davis sought a declaration that his interest in the collected funds was superior to FWFS's interest in Dryer's accounts receivable, and FWFS answered, seeking a declaration that its interest was superior and counterclaiming that Davis was liable for conversion of the collected funds plus prejudgment interest. On cross-motions for summary judgment, the trial court denied Davis's motion, granted FWFS's motion, declared that FWFS had a superior interest in the collected funds, and determined that Davis had converted the funds. The trial court subsequently entered a general judgment that provided a money award to FWFS, but did not allow prejudgment interest. Davis appeals, assigning error to the respective rulings on the parties' motions for summary judgment. FWFS cross-appeals, assigning error to the trial court's denial of prejudgment interest. We affirm on both the appeal and the cross-appeal.

"On review of cross-motions for summary judgment, we examine whether there are any disputed issues of material fact and whether either party was entitled to judgment as a matter of law." *Vision Realty, Inc. v. Kohler*, 214 Or App 220, 222, 164 P3d 330 (2007). Here, neither party asserts that there were disputed issues of material fact that would preclude summary judgment. Instead, each party asserts that its respective interest in the collected funds is superior as a matter of law. FWFS asserts that its prior perfected security interest in Dryer's accounts receivable continued in the proceeds of those accounts and that, as a secured party, FWFS was entitled to trace and recapture those funds from Davis, a lien creditor who had garnished Dryer's accounts receivable. Conversely, Davis asserts that, because FWFS had not enforced its remedies under its security agreement with Dryer as of the time Davis executed on his judgment lien, he took the collected funds free of FWFS's security interest.

The material historical facts of this case are undisputed. FWFS functioned as a commercial lender to Dryer, an electrical business. On November 21, 2002, Dryer executed a promissory note and security agreement, which included Dryer's accounts receivable as collateral to secure a line of credit and "also to secure any and all other liabilities * * * now existing or hereafter arising from [Dryer] to [FWFS]." Dryer was obligated to deposit collections of its accounts receivable into a cash collateral account maintained and controlled by FWFS. The security agreement provided, in part:

"5.12 Notification of Account Debtor. At any time prior to or after default by [Dryer], [FWFS] may notify the account debtors on any of the collateral to make payment directly to [FWFS]. [Dryer], if [FWFS] so requires, shall notify the account debtors of [FWFS's] security interest in their accounts. Until such time as [FWFS] by written notice to [Dryer] elects to exercise said right of notification, [Dryer] is authorized as agent of [FWFS], to collect and enforce the accounts.

"* * * * *

"7.1 Upon the occurrence of any event of default, [FWFS] may at [FWFS's] option and without prior notice declare all notes and other obligations of [Dryer] secured by this agreement immediately due and payable and shall have and may exercise each and all of the rights and remedies granted by the said notes, this agreement, and the Uniform Commercial Code of Oregon [(UCC)]. All remedies of [FWFS] shall be cumulative. * * *

"* * * * *

"8.3 Duties With Respect to Collateral. [FWFS] shall have no duty:

"(a) To collect the collateral or any proceeds;

"(b) To preserve rights of [Dryer] or others against prior or other parties;

"(c) To realize on the collateral in any particular manner or seek reimbursement from any particular source[.]

"* * * * *

"8.4 Non-Waiver By Secured Party. [FWFS] shall not be deemed to have waived any of [FWFS's] rights under this

or any other agreement or instrument signed by [Dryer] unless the waiver is in writing signed by [FWFS]. No delay in exercising [FWFS's] rights shall be a waiver nor shall a waiver on one occasion operate as a waiver of such right on a future occasion."

On March 1, 2004, FWFS filed a financing statement with the Oregon Secretary of State, in accordance with ORS 79.0501 to 79.0516. Dryer and FWFS periodically executed subsequent documents to reflect renewals or extensions of the line of credit or other changes in terms such as the loan fee or interest rate. FWFS filed additional and timely financing statements to maintain its perfected security interest in Dryer's accounts receivable. *See* ORS 79.0515 (providing that, generally, "a filed financing statement is effective for a period of five years after the date of filing," and that "to continue the financing statement or effective financing statement, the secured party may file a continuation statement or an initial financing statement").

Dryer experienced financial difficulties and defaulted on its obligations to FWFS and, on June 9, 2009, FWFS issued Dryer a written notice of default, stating:

"You have repeatedly failed to make deposits to the [FWFS] account, as required, of the collections of your accounts receivable. * * * [Y]ou are hereby given notice of enforcement of the 'Default Rate' of interest which is hereby accelerated to twenty-four percent (24%) effective June 10, 2009. At this time, we are not accelerating the maturity and thereby calling for full payment of the principal and interest. However, we remind you that is within the rights of [FWFS] based upon your failure to perform and it remains an option that may be exercised at any time going forward."

At that time, Dryer owed FWFS $527,264. FWFS believed Dryer's representations that it would be able to resolve its financial problems and make future payments on its obligations. Accordingly, FWFS did not exercise its right to accelerate the debt. Instead, on February 1, 2010, FWFS and Dryer executed a new note with the principal balance due April 30, 2010.

Meanwhile, Dryer was obligated by a collective bargaining agreement to contribute to fringe benefit trust funds

for unionized electrical workers. On February 8, 2010, Dryer entered into a settlement agreement with Davis, a designated collection agent for electrical union employee fringe benefit trusts. Dryer subsequently breached that agreement, and Davis obtained a general judgment upon confession on March 1, 2010, with a money award for $113,221. Between April 8 and May 11, Davis issued writs of garnishment to Dryer's accounts receivable debtors and received payments totaling $67,031.

In August 2010, Dryer informed FWFS that a financial turnaround was "no longer tenable," and they worked out a consensual liquidation plan. On October 8, 2010, FWFS sued Dryer to foreclose its security interest. On January 14, 2011, the trial court entered a judgment of foreclosure in FWFS's favor with money damages of $572,549 and prejudgment interest of 24 percent from April 30, 2010.

That winter, FWFS learned that Davis had garnished funds owed to Dryer's accounts receivable. On February 15, 2011, FWFS demanded in writing that Davis pay over the collected funds. Davis refused.

On April 14, Davis filed an action against FWFS seeking a declaration that Davis's interest in the collected funds was superior to FWFS's interest in those same funds. In his complaint, Davis stated, "On February 15, 2011, defendant [FWFS] made demand upon [Davis] to pay over to [FWFS] the collected funds. [FWFS] asserts a prior security interest in the collected funds. [Davis] assert[s] that [he has] a right to receive and retain the collected funds, superior and paramount to [FWFS's] claim."

FWFS answered and counterclaimed for conversion, arguing that "[Davis's] refusal to return the funds and intentional exercise of control over the funds interferes with FWFS's prior, perfected security interest, and [Davis] should justly be required to turn over the funds or fully reimburse [FWFS]." FWFS asked the trial court to declare that FWFS's security interest in the disputed funds was superior to Davis's judgment lien, and to award the amount of the garnished funds "plus pre and post judgment interest as provided for by law." In the body of the counterclaim, FWFS

set forth the amounts and dates of the garnishments. FWFS also alleged, as Davis had previously admitted, that FWFS had demanded return of the collected funds, and Davis had refused. FWFS did not allege the date on which it had made demand.

In response to FWFS's counterclaim, Davis asserted that FWFS had failed to "state ultimate facts sufficient to constitute a claim," but did not move to dismiss or further develop its defense. *See* ORCP 21 A(8) (providing, as a defense, "failure to state ultimate facts sufficient to constitute a claim"). Both parties moved for summary judgment.

In arguing in support of its motion for summary judgment, Davis did not dispute that FWFS had a valid, perfected security interest in Dryer's accounts receivable. Rather, Davis argued that, because FWFS did not accelerate Dryer's debt, or demand direct payment from Dryer's accounts receivable debtors, Dryer was able to continue operating its business, thereby accruing obligations to Davis; thus, as a matter of equity and of policy, the court should conclude that FWFS had waived technical default and forfeited priority with respect to its security interest in Dryer's accounts receivable.

Davis contended that a security interest in intangible accounts receivable is a "different creature" than a security interest in tangible property like equipment, goods, and inventory, because the means of enforcing a security interest in accounts receivable is different. According to Davis, if a secured party fails to exercise the right of direct payment—and, consequently, a third-party debtor pays the debtor and the debtor then uses those funds to pay another party—those accounts receivable proceeds "just dissolve." That is, the proceeds of accounts receivable are not traceable to a third party. In other words, Davis argued, "the right of the secured party is to intercept the money that would otherwise come from the account debtor." Davis asserted that the result should be the same whether the third party pays the debtor directly and the debtor pays an unsecured creditor, or if the funds reach the unsecured creditor by writ of garnishment.

FWFS responded that it had not waived its security interest by failing to exercise elective remedies. FWFS asserted that a security interest remains attached to the collateral unless a specific exception to the continuation of the security interest exists. FWFS contended that Davis had not identified any applicable exception and, further, that nothing in the security agreement or the UCC required that its security interest be subordinated to a garnishing lien creditor.

In support of its motion for summary judgment on its conversion counterclaim, FWFS argued that, even when a party lawfully gains possession of personal property, the refusal to redeliver the personal property on demand by the owner constitutes conversion. FWFS contended that Davis had converted the funds because FWFS had demanded that Davis pay over the funds, and Davis had refused. However, in a somewhat contradictory fashion, FWFS requested the trial court enter a money award "for an equivalent value of the funds * * * with prejudgment interest at the legal rate *from the date of each garnishment.*" (Emphasis added.)

After a hearing on the matter, the trial court granted FWFS's motion for summary judgment, declaring that FWFS's perfected security interest had priority over Davis's judgment lien, and concluding that Davis had converted the collected funds. In so holding, the court did not make any factual finding as to the date that Davis's conversion had occurred. FWFS's counsel submitted a proposed general judgment that provided for "Pre-Judgment Interest 9% from 5/11/10,"—*i.e.*, the date of the last garnishment. The trial court signed the judgment, but struck that language from the form of judgment, thereby denying prejudgment interest. The parties and the court did not discuss whether, or from what date, prejudgment interest should be awarded, and the court did not express its reason for denying prejudgment interest.

Davis appeals, assigning error to the trial court's disposition of the parties' cross-motions for summary judgment, and reprising his contentions before the trial court. FWFS cross-appeals, assigning error to the denial of prejudgment interest.

Reduced to its essentials, Davis's overarching contention on appeal is that he took the funds free of FWFS's security interest because FWFS waived its rights as a prior perfected secured party by failing to exercise elective remedies after default and before Davis obtained judgment and collected the disputed funds.[1] As amplified below, we reject that contention and conclude that the trial court did not err in declaring that FWFS's interest in the funds is superior to Davis's.

We similarly reject Davis's assignment of error pertaining to the allowance of summary judgment on FWFS's conversion counterclaim. As explained below, while Davis was entitled to the collected funds at the time of garnishment, he took those funds subject to FWFS's prior perfected security interest. Accordingly, Davis converted the collected funds when he refused to return them after FWFS had accelerated Dryer's debt and foreclosed on its security interest in Dryer's accounts receivable. Finally, for the reasons explained below, we conclude that, contrary to its assertion on cross-appeal, FWFS is not entitled to prejudgment interest.

We return to Davis's first proposition—*viz.*, that FWFS waived its rights as a prior perfected secured party by failing to exercise elective remedies. Under the terms of the security agreement here, *see* 260 Or App at 194-95, and, particularly, section 8.4, any delay in exercising rights provided in the security agreement "shall not be deemed a waiver." Accordingly, the issue is whether, notwithstanding the language of the security agreement, waiver (as Davis posits) nevertheless occurred by operation of law. The resolution of that question is, in turn, determined by reference to ORS chapter 79, which governs secured transactions in personal property and applies to FWFS's security interest in Dryer's accounts receivable. *See* ORS 79.0109(1)(a), (c) (providing that ORS chapter 79 applies to any "transaction, regardless of its form, that creates a security interest in personal property or fixtures by contract," including, but not limited to, sales of "accounts, chattel paper, payment intangibles or promissory notes").

---

[1] We reject Davis's other ancillary contentions without further published discussion.

In enacting ORS chapter 79, the legislature substantially adopted Article 9 of the UCC. Accordingly, we "examine the history of the uniform act and the context that led to its creation" to inform our analysis of that act. *Datt v. Hill*, 347 Or 672, 680, 227 P3d 714 (2010). "Because the UCC is a uniform law that, to the extent possible, should be interpreted uniformly, case law from other states provides part of the statutory context." *Edward D. Jones & Co. v. Mishler*, 161 Or App 544, 556, 983 P2d 1086 (1999).

Before canvassing that case law—and, specifically, the two lines of ostensibly irreconcilable authority on which the present parties' positions are predicated—it is useful to briefly recapitulate the essential features of FWFS's security interest, which is the ultimate referent for that inquiry. FWFS's security interest in Dryer's accounts receivable attached on November 2, 2002, when FWFS and Dryer entered into the security agreement. ORS 79.0203. At that point, FWFS had rights to Dryer's accounts receivable and the proceeds thereof, as provided in the security agreement and the UCC. FWFS perfected that interest by filing a financing statement on March 1, 2004. ORS 79.0310(1). That interest continued because FWFS routinely updated the financing statements associated with its security interest. ORS 79.0308(3). Additionally, FWFS's security interest continued in the identifiable proceeds of Dryer's accounts receivable. ORS 79.0315.

As noted, the parties view, and frame, this dispute in starkly different ways. According to FWFS, the resolution is straightforward, involving the unexceptional application of principles of priority codified in Article 9 and refined in decisional law. Davis posits that the dispute is subtle and nuanced, turning on the resolution of an interstitial issue of first impression in Oregon law. In that regard, Davis points to divergent approaches adopted by other jurisdictions in determining priority in similar circumstances, *viz.*, addressing whether, or when, a secured creditor is entitled to trace collateral into the hands of a garnishing creditor.

We agree with Davis that this matter is not so simple as FWFS assumes—and does, indeed, present a matter of first impression in reported Oregon decisions.

Accordingly, we begin with a somewhat detailed treatment of the two distinct approaches adopted in other jurisdictions. Those approaches can be denominated, respectively, as the "waiver" approach (which approximates Davis's position) and the "trace and recapture" approach (which corresponds to FWFS's position).

Davis invokes a series of federal cases from the Northern District of Illinois. *See, e.g., S.E.I.U. Local No. 4 Pension v. Pinnacle Health,* 560 F Supp 2d 647 (ND Ill 2008) (*S.E.I.U.*); *Shales v. Pipe-Liners, Ltd.,* 2012 WL 4793499 (ND Ill Oct 9, 2012). In *S.E.I.U.,* the plaintiff SEIU was the trustee of a union pension fund and health plan that had received a judgment against Pinnacle for delinquent contributions. 560 F Supp 2d at 648. SEIU obtained an order for release of funds held by the Attorney General of the State of Illinois for sums due Pinnacle from the Illinois Department of Healthcare and Family Services (IDHFS). *Id.* When SEIU filed a second motion for release of funds, Premier Bancorps (Premier), a perfected secured creditor with an interest in Pinnacle's accounts receivable, intervened, arguing that its security interest in the funds that IDHFS owed Pinnacle was superior to SEIU's judgment lien interest in those same funds. *Id.*

Similarly to FWFS and Dryer here, Premier and Pinnacle in *S.E.I.U.* had shared an ongoing borrowing relationship wherein the parties executed multiple promissory notes and security agreements over the course of a number of years. *Id.* at 648 n 2. The security agreement at issue provided:

"Until default and except as otherwise provided below with respect to accounts, [Pinnacle] may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement to the Related Documents[.]

"\* \* \* \* \*

"If an Event of Default occurs under this Agreement, at any time thereafter, [Premier] shall have all the rights of a secured party under the Illinois Uniform Commercial Code. In addition and without limitation, [Premier] may exercise any one or more of the following rights and remedies: [list

includes acceleration of the debt, obtain deficiency judgment, among others].”

*Id.* at 650 (final brackets in original).

Before the priority dispute, Premier had not declared Pinnacle to be in default. *Id.* at 648-49. However, during the course of the litigation over the release of funds, Premier asserted that Pinnacle had defaulted by making late payments on its loans, and that SEIU's judgment lien and motion for release of the secured funds constituted a default under the terms of the security agreement. *Id.* at 649. The court reasoned:

> “The Security Agreement makes clear that Premier only takes on the rights of a secured creditor under the UCC after a default occurs. Default, therefore, is the essential prerequisite and in the absence of such, Premier cannot seize the collateral and apply it against the loan or otherwise prevent another creditor of [Pinnacle] from taking possession of the collateral.”

*Id.* at 650. The court concluded that, notwithstanding Premier's perfected security interest in Pinnacle's accounts receivable, and “despite the fact that Pinnacle may have technically defaulted on its loan, because Premier did not declare Pinnacle's loan in default or follow procedures required by the Security Agreement to enforce its UCC and contractual rights, Premier [did] not have a *present right* to the funds nor a basis on which to object to their release.” *Id.* at 651 (emphasis added). In so holding, the court did not reach the issue of whether, after declaring default, Pinnacle would be entitled to trace and recapture the funds.[2]

More recently, in *Shales*, the Northern District of Illinois applied its holding in *S.E.I.U.* As in *S.E.I.U.*, *Shales* involved a priority dispute between an unsecured judgment creditor and a secured party with a prior perfected security interest in the debtor's accounts. The security agreement in

---

[2] *See also One CW, LLC v. Cartridge World North America, LLC*, 661 F Supp 2d 931 (ND Ill 2009) (reaching the same result in a case involving identical contract language and similar facts to those in *S.E.I.U.*). *Cf. West Bend Mut. Ins. v. Belmont State Corp.*, 2010 WL 5419061 (ND Ill Dec 23, 2010), *aff'd*, 712 F3d 1030 (7th Cir 2013) (distinguishing *S.E.I.U.* and *One CW, LLC* because the security agreement in *West Bend* case “contain[ed] no preconditions or qualifications to claiming [a] security interest”).

*Shales* contained "the *exact same language* as the agreement in *S.E.I.U.*" 2012 WL 4793499 (emphasis in original). The court concluded that, because the secured party "took no action" until after the unsecured creditor had obtained its judgment lien against the debtor, the judgment lien had priority over the secured party's interest. *Id.* In other words, the court deemed the secured party to have constructively waived its security interest, precluding any entitlement to trace and recapture the funds from the collateral accounts.

In sum, in *S.E.I.U.* and *Shales*, the court construed language in the security agreement to impose three conjunctive preconditions to the creditor's enforcement of its security interest in the collateral funds, *viz.*, that (1) a default occur, (2) the secured party declare default, and (3) the secured party take "affirmative steps" to exercise its rights. If any of those conditions remains unsatisfied as of the time that the unsecured lien creditor garnishes the collateral—for example, if the secured creditor has not declared a default or has not exercised its remedies under the security agreement— the secured party is deemed to have constructively waived its priority *vis-à-vis* the lien creditor, and, thus, cannot trace and recapture its collateral from the garnishor.

Davis asserts that the security agreement here contains provisions similar to those in the waiver cases and, because FWFS failed to take affirmative steps to exercise its rights after default and *before* Davis obtained judgment and collected the disputed funds, FWFS's interest in those funds was "extinguished." Davis further posits, by parity of reasoning, that, because he took the funds lawfully, he did not convert them. We will address those contentions after describing a different approach.

The counterpoint to the "waiver" approach—and the foundation of FWFS's position—is the "trace and recapture" approach. Under that approach, before and until a secured party declares default and acts on its rights to collateral, a garnishor is entitled to take the collateral; however, in doing so, the garnishor takes traceable collateral subject to the secured party's interest. Thus, unlike the waiver approach, the secured party maintains its security interest, despite a

period of inaction after default and before a judgment creditor takes the funds.

Frierson v. United Farm Agency, Inc., 868 F2d 302 (8th Cir 1989), is exemplary. There, a judgment creditor, Frierson, garnished funds held in the debtor United Farm Agency, Inc.'s (UFA's) bank accounts. Merchants Bank (Merchants) asserted a superior interest in the funds pursuant to its prior perfected security interest in UFA's deposit accounts. The security agreement provided that default occurred upon UFA's failure to discharge any judgment or attachment within 30 days. Because Frierson's judgment was entered on January 9, 1987, a default existed under the loan agreement on February 8, 1987, 30 days after the judgment was entered, and long before the garnishment summons was served on May 20, 1987. Id. at 303-04. However, Merchants did not at any time—including during the litigation over priority to the garnished funds—ever declare a default or seek to enforce its remedies.

The trial court determined that, "because Merchants did not declare the loan in default or follow procedures required by the loan agreement to enforce its UCC and contract rights, Merchants had neither a present right to the funds nor a right to have the garnishment quashed." Id. at 303. In so holding, the court recognized:

"Most secured loans provide for numerous events which constitute default, many of which are technical in nature and are inserted in the loan documents to enable the lender to declare the note in default when even a relatively minor problem arises with the loan or the debtor. Thus, at any given time many secured loans are technically in default, but are never treated as such by secured creditors. In addition, a secured party will occasionally * * * ignore a default which is more than just a technical default. If a secured creditor with a security interest over all the debtor's property is permitted to rely on a default, whether technical or not, to prevent another creditor from executing on the debtor's property, while treating the loan as not in default when dealing with the debtor and others, severe inequities would result. * * * Such an approach would be against both the spirit and the letter of the Uniform Commercial Code."

Id. at 304-05 (internal quotation marks omitted).

On appeal, the Eighth Circuit affirmed, but elaborated on the proper application of Article 9-based priority in such circumstances. Specifically, the court explained that

"[the secured party] cannot refuse to exercise its rights under the security agreement, thereby maintaining [the debtor] as a going concern, while it impairs the status of other creditors by preventing them from exercising valid liens. Allowing [the secured party] to do so would fly in the face of Article 9, which is premised on the debtor's ability to exercise rights in the property. *Regardless of whether the funds in question are viewed as collateral or as proceeds, Article 9 requires that [the unsecured judgment creditor garnishor] take the remaining funds subject to [the secured party's] security interest if [the secured party] refuses to exercise its remedies under the code. [The secured party's] security interest in the funds will continue, and [the secured party] can trace and recapture when it chooses to declare the loan in default and accelerate the debt."*

*Id.* at 305 (citations omitted; emphasis added).

Thus, the court held that, while Frierson had a right to the funds, that right was, "of course, subject to Merchant's security interest." *Id.* That is so because the prior perfected security interest in the collateral does not "dissolve"; rather, it continues so that other creditors take subject to the secured creditor's interest. *See also Martens v. Hadley Memorial Hosp.*, 729 F Supp 1391, 1395 (D DC 1990) (holding that, "[i]n the absence of [the secured party's] exercise of its right to accelerate the debts underlying [the security agreement], the [secured party's] remedies under the UCC do not *presently* serve to defeat the writ of attachment" (emphasis added)); *Bank of Hawaii v. DeYoung*, 92 Haw 347, 351-53, 992 P2d 42, 46-48 (2000) (holding that the debtor's rights to pledged shares of stock were properly transferred to a judgment lien creditor by way of garnishment, pursuant to a state statute that specifically allows for garnishment of secured collateral; however, those shares remained subject to the secured party's prior perfected security interest).

Faced with the choice between the contending "waiver" and "trace and recapture" constructs, we note that each implicates two interrelated considerations of commercial practicability: (1) a secured party's recourse against

the collateral and (2) a debtor's ability to alienate the collateral.

We conclude that, ultimately, the "trace and recapture" approach better accommodates those interests consistently with the fundamental framework of Article 9 than does the "waiver" approach. ORS 79.0317 governs priority of competing claims to the same collateral. As applicable here, that section provides that a security interest is subordinate to the rights of a lien creditor whose lien interest predates perfection of the competing security interest. ORS 79.0317(1)(b)(A) ("A security interest or agricultural lien is subordinate to the rights of *** a person that becomes a lien creditor before *** [t]he security interest or agricultural lien is perfected[.]"). Stated as a positive, "a secured creditor with a perfected security interest in collateral is entitled to priority over a subsequent lien creditor seeking to claim the same collateral." *DeYoung*, 92 Haw at 353, 992 P2d at 48. Here, it is undisputed that FWFS perfected its security interest in Dryer's accounts receivable on March 1, 2004, and that interest continued by way of FWFS filing continuing and initiating financing statements. It is also undisputed that Davis became a judgment lien creditor after FWFS perfected its interest. Accordingly, FWFS has priority under ORS 79.0317.

The primacy of a prior perfected secured creditor's claim to collateral is the "touchstone" of Article 9, which starts with a sweeping rule of priority and then carves out exceptions to that rule. To be sure, the ability to enforce a prior perfected security interest in collateral, as against the debtor's interest, depends on the debtor's default. However, priority, with respect to other creditors' claims against the same collateral, is not capable of being lost in the manner that the "waiver" approach suggests.

As the *Frierson* court recognized, after a debtor has defaulted, and whether or not the secured party has declared default, the secured party may choose not to accelerate the debt or otherwise exercise its rights to the collateral for a variety of reasons. For example, the secured party might choose to ignore a default in hopes that the debtor's business may improve, which may allow the debtor to pay a

greater portion of its debts—particularly, as here, where a secured party's exercise of rights in collateral might require a debtor to wind up its business. Conversely, in the event that the debtor is able to resolve its financial problems, the secured party and other creditors would be more likely to realize their interests. In the event that the debtor is unable to resolve its financial problems, the secured party has not waived its priority by allowing the debtor to attempt to cure default. To hold otherwise would be to require secured parties to act immediately to realize on collateral in any and every event of technical default, or risk losing their interest in collateral, whether outright or by subordination. Neither the security agreement at issue here nor the UCC contemplates such compulsion.

The "trace and recapture" approach is consistent with the UCC determination of priority, continuation of a security interest, and tracing the identifiable proceeds of collateral. We adopt and apply the trace and recapture approach to the facts of this case. FWFS declared default in June 2009; at that point, FWFS was entitled to accelerate the debt *"at [FWFS's] option." See* 260 Or App at 194 (emphasis added). That right continued as long as Dryer remained in default on its obligations. As pertinent here, Davis received payments from Dryer's accounts receivable debtors subject to writs of garnishment between April and May 2010. At all of the pertinent times, Dryer remained in default and FWFS had a right to accelerate the debt. However, because FWFS had not yet exercised its right to Dryer's accounts receivable, Davis had a right to the funds at the time of garnishment, subject to FWFS's prior perfected security interest. Because FWFS was entitled to trace and recapture its collateral, notwithstanding its delay in accelerating Dryer's debt and foreclosing on its security interest in Dryer's accounts receivable, FWFS was entitled to return of the collected funds, because those funds were identifiable proceeds of Dryer's accounts receivable. Accordingly, the trial court correctly entered summary judgment for FWFS with respect to the claim for declaratory relief.

That conclusion, in turn, informs our analysis and disposition of Davis's assignment of error challenging the

allowance of summary judgment on FWFS's counterclaim for conversion. In *Oregon Bank v. Fox*, 73 Or App 612, 615, 699 P2d 1147 (1985), we explained:

> "An action for conversion lies when there has been an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel. A secured creditor with the right to possession of the collateral after default may maintain an action for conversion against one who has exercised unauthorized acts of dominion over the property to the exclusion of the creditor's rights."

(Citations omitted.) "Bad faith is not required; the gravamen of the tort is the defendant's intent to exercise control over the chattel inconsistently with the plaintiff's rights." *Naas v. Lucas*, 86 Or App 406, 409, 739 P2d 1051, *adh'd to as modified on recons*, 88 Or App 141, 744 P2d 586, *rev den*, 304 Or 680 (1987). "An actor commits conversion if the actor mistakenly believes that he or she is acting legally with respect to the other person's property[.] * * * In character or degree, conversion may occur on a spectrum from the most outright, blatant kind of theft to what may be regarded as innocent conversion." *In re Martin*, 328 Or 177, 184-85, 970 P2d 638 (1998) (citations and internal quotation marks omitted). "[W]hen the act consists of a wrongful taking, assumption of ownership over or use of the property, there is no necessity for a demand; the defendant's conduct is sufficient to prove the conversion." *Oregon Bank*, 73 Or App at 617.

When Davis initially took the funds, FWFS had not exercised its right to those funds; therefore, for conversion purposes, Davis did not exercise "acts of dominion" over the funds "to the exclusion of [FWFS's] rights" at the time of the garnishments. *Id.* at 615. Although, as a general matter, a claim for conversion may lie without demand for return of the property, *id.* at 617, here, where the original taking was lawful, conversion did not occur until FWFS exercised its right to recapture its collateral by demanding return of the collected funds. After that demand, Davis's retention of the collected funds was wrongful. Accordingly, the trial court did not err in granting FWFS's motion for summary judgment on its counterclaim for conversion.

Finally, we address FWFS's contention on cross-appeal that the trial court erred in denying prejudgment interest. "We review the trial court's denial of an award of prejudgment interest for errors of law." *Spaid v. 4-R Equipment, LLC*, 252 Or App 228, 229, 287 P3d 1138 (2012), *rev den*, 353 Or 280 (2013).

The measure of damages for the conversion of personal property "is the value of the property at the time of the conversion, with interest." *Weinke v. Majeske*, 163 Or 483, 491, 97 P2d 179 (1939) (internal quotation marks omitted); ORS 82.010.[3] A party seeking prejudgment interest "must specifically plead a foundation for prejudgment interest. To do so, that party must (1) request prejudgment interest in the prayer and (2) plead facts sufficient to state a claim for prejudgment interest." *Emmert v. No Problem Harry, Inc.*, 222 Or App 151, 158, 192 P3d 844 (2008) (citation omitted). A party sufficiently states a claim for prejudgment interest where a party alleges, in the body of its complaint, "the exact amount claimed to be due and the dates during which [the] plaintiff claimed it was deprived of the use of its money." *Holman Transfer Co. v. PNB Telephone Co.*, 287 Or 387, 406, 599 P2d 1115 (1979).

On appeal, FWFS contends that, "[f]rom an objective, post judgment perspective, the amounts and dates of

---

[3] ORS 82.010(1) provides:

"The rate of interest for the following transactions, if the parties have not otherwise agreed to a rate of interest, is nine percent per annum and is payable on:

"(a) All moneys after they become due; but open accounts bear interest from the date of the last item thereof.

"(b) Money received to the use of another and retained beyond a reasonable time without the owner's express or implied consent.

"(c) Money due or to become due where there is a contract to pay interest and no rate specified."

We have held that the collected funds were not due to FWFS on the dates of garnishment, but that FWFS was entitled to the funds after it foreclosed on its security interest and demanded the return of the funds. 260 Or App at 208. Accordingly, ORS 82.010(1)(b) applies because, for prejudgment interest purposes, the collected funds are comprised of "[m]oney had and received to the use of another [(Davis)] and retained beyond a reasonable time without the owner's [(FWFS's)] express or implied consent." We need not address whether Davis withheld the funds from FWFS "beyond a reasonable time" after FWFS's demand for their return because, here, Davis never returned the collected funds and clearly had no intention to do so.

damage are readily ascertainable," and points to its counterclaim, wherein it alleged the specific dates and amounts of the garnishments.

Our inquiry reduces to whether, *in its counterclaim complaint*, FWFS alleged "the exact amount claimed to be due *and the dates during which [it] claimed it was deprived of the use of its money." Holman Transfer Co.*, 287 Or at 406 (emphasis added). The only dates that FWFS offered in its counterclaim for conversion were the *dates of the garnishments*, which, as noted, were not the operative dates of conversion, and FWFS contended only that prejudgment interest should run from the dates of the garnishments, or the last of those dates (May 11, 2010). To be sure, *Davis*, in *its* complaint included the date (February 15, 2011) that FWFS had demanded return of the funds, but *FWFS* did not include that date as an allegation in its counterclaim for conversion, and, importantly, FWFS did not identify that date as the date that it "claimed it was deprived of the use of its money." *Id.* Thus, FWFS never pleaded the correct date from which prejudgment interest could properly run and, instead, pleaded only legally erroneous dates. In those circumstances, the trial court did not err in denying prejudgment interest.

Affirmed on appeal and cross-appeal.