13-2187-bk
*In Re: Motors Liquidation Co.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT


August Term, 2013


(Argued: March 25, 2013          Question Certified: June 17, 2014


Docket No. 13-2187-bk


In Re: MOTORS LIQUIDATION COMPANY, et al.,

*Debtor*,

---

OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF MOTORS
LIQUIDATION COMPANY,

*Plaintiff-Appellant*

-v.-

JP MORGAN CHASE BANK, N.A., individually and as Administrative Agent
for various lenders party to the Term Loan Agreement described herein,

*Defendant-Appellee.*

---

Before:
            WINTER, WESLEY, AND CARNEY, *Circuit Judges.*

Direct appeal pursuant to 28 U.S.C. § 158(d)(2) from an order of the United States Bankruptcy Court for the Southern District of New York (Robert E. Gerber, United States Bankruptcy Judge) holding that a mistakenly filed UCC-3 termination statement was unauthorized and therefore not effective to terminate a secured lender's interest in a debtor's property. We conclude that this case presents an issue of first impression under Delaware law—whether a secured lender must authorize the act of filing a UCC-3 termination statement or must authorize the termination of the security interest identified for termination on that UCC-3 statement—and certify the question to the Delaware Supreme Court.

QUESTION CERTIFIED.

ERIC B. FISHER (Barry N. Seidel, Katie L. Weinstein, Jeffrey Rhodes, *on the brief*), Dickstein Shapiro LLP, New York, NY, *for Plaintiff-Appellant*.

JOHN M. CALLAGY (Nicholas J. Panarella, Martin A. Krolewski, *on the brief*), Kelley Drye & Warren LLP, New York, NY, *for Defendant-Appellee*.

WESLEY, *Circuit Judge*:

In October 2001, General Motors entered into a synthetic lease financing transaction (the "Synthetic Lease"), by which it obtained approximately $300 million in financing from a syndicate of financial institutions. The proceeds were used to acquire and construct facilities on several properties. General Motors' obligation to repay the Synthetic Lease was secured by liens on twelve pieces of

2

real estate.  The lenders' security interests in General Motors' properties were perfected by filing UCC-1 financing statements in the counties in which the properties were located and with the Delaware Secretary of State.  JPMorgan served as administrative agent for the Synthetic Lease and was identified on the UCC-1s as the secured party of record.

Five years later, in November 2006, General Motors and then-subsidiary Saturn Corporation entered into a separate term loan facility (the "Term Loan"). The Term Loan was entirely unrelated to the Synthetic Lease and provided General Motors with approximately $1.5 billion in financing from a different syndicate of financial institutions.  To secure the loan, the lenders took security interests in a large number of General Motors' assets, including all of General Motors' equipment and fixtures at forty-two facilities throughout the United States.  JPMorgan served as administrative agent and secured party of record for the Term Loan and caused the filing of twenty-eight UCC-1 financing statements to perfect the lenders' security interests in the collateral.  The Main Term Loan UCC-1 was filed with the Delaware Secretary of State and bore file number "6416808 4."

## A.    *Termination of the Synthetic Lease*

The Synthetic Lease was scheduled to mature on October 31, 2008.  In September 2008, General Motors contacted Mayer Brown LLP, its counsel responsible for the Synthetic Lease, and explained that it planned to repay the amount due under the Synthetic Lease.  General Motors requested that Mayer Brown prepare the documents necessary for JPMorgan and the lenders to be repaid and to release the interests the lenders held in General Motors' property.

Mayer Brown Partner Robert Gordon assigned the work to an associate and instructed him to prepare a closing checklist and drafts of the documents required to pay off the Synthetic Lease and to terminate the lenders' security interest in General Motors' property.  Over the next two weeks, the associate prepared (1) a Closing Checklist that identified the actions required to unwind the Synthetic Lease; (2) a Termination Agreement by which General Motors formally exercised its option to repay the amount due under the Synthetic Lease and be released from the related liens against General Motors' properties; (3) a set of UCC-3 termination statements to terminate liens held against General Motors' properties; and (4) an Escrow Agreement governing title company LandAmerica's role in closing the transaction.

### 1. The Closing Checklist

The Mayer Brown associate prepared a closing checklist that included several dozen actions and documents required to unwind the Synthetic Lease. Among the items on the Closing Checklist was a list of security interests held by General Motors' lenders that would need to be terminated. To prepare the list of security interests, the associate asked a paralegal, unfamiliar with the transaction or the purpose of the request, to perform a search for UCC-1 financing statements that had been recorded against General Motors in Delaware. The paralegal's search identified three UCC-1s, numbered 2092532 5, 2092526 7, and 6416808 4. Neither the paralegal nor the associate realized that only two of the UCC-1s were related to the Synthetic Lease transaction. The third UCC-1, number 6416808 4, related to the 2006 Main Term Loan UCC-1. Not noticing that one of the UCC-1s was unrelated to the Synthetic Lease, the associate placed all three for termination in the Closing Checklist:

> Termination of UCCs (central, DE filings)
> *Blanket-type financing statements as to real property and related collateral located in Marion County, Indiana (file number 2092532 5, file date 4/12/02 and file number 2092526 7, file date 4/12/02))*
> *financing statement as to equipment, fixtures and related collateral located at*

*certain U.S. manufacturing facilities (file
number 6416808 4, file date 11/30/06)*

On the afternoon of October 15, 2008, Mayer Brown circulated a draft of the checklist to JPMorgan's counsel, Simpson Thacher. A largely identical draft was distributed later that evening and another on October 21. No one at General Motors, Mayer Brown, Simpson Thacher, or JPMorgan recognized that one of the UCC-1s identified in the checklist for termination was filed in 2006 rather than 2002 and was entirely unrelated to the Synthetic Lease.

### 2.    The Termination Agreement

The Mayer Brown associate also prepared a Termination Agreement, which he also circulated to Simpson Thacher on October 15, 2008. The Termination Agreement stated that General Motors was exercising its option to repay the amount due under the Synthetic Lease, that the Operative Agreement underlying the Synthetic Lease was terminated, and that JPMorgan and the Lessor were releasing all of their related liens against General Motors' properties. To that end, the Termination Agreement expressly authorized General Motors to terminate the Synthetic Lease liens:

> [T]he Administrative Agent [JPMorgan] and the Lessor do hereby (x) release all of their Liens . . . against the Properties created by the Operative Agreements [of the Synthetic Lease], (y) acknowledge that such Liens and Lessor Liens are forever released, satisfied and

discharged and (x) [*sic*]  authorize Lessee to file a termination of any existing Financing Statements relating to the Properties [of the Synthetic Lease].

All parties agree that the Synthetic Lease Termination Agreement does not relate to the Term Loan or to the properties and liens securing it.

### 3.    The UCC-3 Termination Statements

Along with the Termination Agreement, Mayer Brown also circulated to Simpson Thacher three draft UCC-3 statements to terminate the three UCC-1 security interests set out for termination in the Closing Checklist.  One of the draft statements was a UCC-3 to terminate 6416808 4, the Main Term Loan UCC-1.  As explained above, this UCC-1 was connected with the Term Loan and entirely unrelated to the Synthetic Lease.

On October 15, 2008, the Mayer Brown associate e-mailed all three draft UCC-3s to Simpson Thacher, along with the Termination Agreement and a copy of the Closing Checklist.  Simpson Thacher attorney Mardi Merjian responded two days later as follows: "Nice job on the documents.  My only comment, unless I am missing something, is that all references to JPMorgan Chase Bank, as Administrative Agent for the Investors should not include the reference 'for the Investors.'"

**4.  The Escrow Agreement & Transaction Closing**

After preparing the required documents, the parties relied on the title company LandAmerica to complete the transaction by serving as escrow agent, recording agent, and title insurance issuer.  On behalf of General Motors, Mayer Brown drafted an agreement (the "Escrow Agreement") providing LandAmerica with instructions to effectuate the closing.  Pursuant to the Escrow Agreement, LandAmerica would receive funds from General Motors along with numerous documents executed by the parties.  LandAmerica would then close the transaction and disburse the funds to General Motors' creditors, thereby accomplishing General Motors' repayment and terminating the Synthetic Lease.

Among other things, the Escrow Agreement specified that the parties would deliver various documents to LandAmerica in preparation for closing. Then, at the time of closing, LandAmerica would handle those documents in accordance with the Escrow Agreement's instructions.  One category of required documents was the set of UCC-3 statements that would be filed to terminate liens against General Motors' properties.  The Escrow Agreement provided that LandAmerica was to receive final sets of the three "Termination of UCC Financing Statements" (which it identified by file number) and that immediately

8

following closing, LandAmerica was to forward copies of these and other escrow documents to General Motors' counsel, who would then file them on General Motors' behalf.

On October 24, 2008, the Mayer Brown associate e-mailed a draft of the Escrow Agreement to JPMorgan's counsel, Simpson Thacher attorney Mardi Merjian. He concluded the e-mail by requesting that Merjian review the document and respond with any comments. On October 27 the associate e-mailed Merjian again, explaining that he would send a package of documents for JPMorgan and the lenders to execute. He concluded the e-mail by again asking whether Merjian had any comments on the draft Escrow Letter, to which Merjian responded, "it was fine."

General Motors repaid the amount due on the Synthetic Lease on October 30, 2008. As outlined in the Escrow Agreement, LandAmerica thereafter forwarded copies of the UCC-3 termination statements to General Motors' counsel, Mayer Brown. Mayer Brown then caused all three UCC-3s to be filed with the Delaware Secretary of State—including the UCC-3 that erroneously identified for termination the Main Term Loan UCC-1 that was entirely unrelated to the Synthetic Lease.

9

*B.*     *General Motors' Chapter 11 Bankruptcy Filing*

The mistake went unnoticed until General Motors filed for chapter 11

reorganization in June 2009.  On June 19, Morgan Lewis & Bockius LLP, then

counsel to JPMorgan, e-mailed the Committee to inform it that a UCC-3

termination statement had been inadvertently filed in October 2008 relating to

the Term Loan collateral.  Morgan Lewis attached an affidavit from Robert

Gordon, the Mayer Brown partner who had been in charge of the Synthetic Lease

termination.  The affidavit explained that JPMorgan and Mayer Brown had

intended to terminate only liens related to the Synthetic Lease and that because

the UCC-3 statement erroneously identified for termination a UCC-1 related to

the Term Loan, the termination statement was unauthorized and ineffective.

On July 31, 2009, the Committee commenced the underlying action against

JPMorgan in the United States Bankruptcy Court for the Southern District of

New York.  The Committee sought a determination that, despite the error, the

UCC-3 was nonetheless effective to terminate the Main Term Loan UCC-1, that

the security interest was terminated prior to General Motors' chapter 11 filing,

and that most of the indebtedness under the Term Loan is therefore unsecured.

On cross-motions for summary judgment the bankruptcy court concluded that

the UCC-3 filing was unauthorized and therefore not effective to terminate the security interest and granted summary judgment to JPMorgan. *Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, 486 B.R. 596 (Bankr. S.D.N.Y. 2013). The bankruptcy court then certified the case for direct appeal to this Court pursuant to 28 U.S.C. § 158(d)(2).

## DISCUSSION

At the heart of this dispute lies a straightforward question: Did the UCC-3 filing effectively terminate the Main Term Loan UCC-1 even though the intent of everyone involved was to terminate only UCC-1 security interests related to the Synthetic Lease? The answer to that question is governed by the Uniform Commercial Code. Because the secured debtor, General Motors, is incorporated under the laws of the State of Delaware, it is Delaware's version of the UCC that controls. *See* U.C.C. §§ 9-301, 9-307(e).

### A.     *UCC Provisions Concerning the Effectiveness of UCC-3 Filings*

Prior to 2001, the UCC required that UCC-3 termination statements and other financing statement amendments be signed by the secured party of record. This complicated electronic filing because, among other reasons, electronic filing

11

requirements varied among filing offices, and some lawyers, in an abundance of caution, doubted the legal efficacy of electronically signed documents. *See* Harry C. Sigman, *The Filing System Under Revised Article 9*, 73 Am. Bankr. L.J. 61, 68 (1999). In 2001, however, UCC Article 9 was amended[1] to pave the way for electronic filing by requiring the secured lender's "authorization" rather than its signature. The 2001 amendment loosened the authorization-by-lender's-signature requirement to an authorization-by-any-means requirement and provides, in its present form, that *any* person may file a UCC-3 termination statement as long as authorized by the secured party of record.

Three sections of Revised Article 9 are particularly relevant to determining whether the UCC-3 effectively terminated the Main Term Loan UCC-1. First, U.C.C. § 9-513 provides that ordinarily a UCC-1 financing statement ceases to be effective at the time a UCC-3 termination statement is filed:

> (d) **[Effect of filing termination statement.]** Except as otherwise provided in Section 9-510, upon the filing of a termination statement with the filing office, the financing statement to which the termination statement relates ceases to be effective.

---

[1] Revised UCC Article 9 was adopted into Delaware law effective July 1, 2001. Del. Code Ann. tit. 6, art. 9 (2001).

However, U.C.C. § 9-510 clarifies that a termination statement or other filing is ineffective if filed by a person other than one permitted to do so:

> (a) **[Filed record effective if authorized.]** A filed record is effective only to the extent that it was filed by a person that may file it under Section 9-509.

Finally, U.C.C. § 9-509 explains the circumstances in which a person may file a termination statement or other amendment:

> (d) **[Person entitled to file certain amendments.]** A person may file an amendment other than an amendment that adds collateral covered by a financing statement or an amendment that adds a debtor to a financing statement only if:
>> (1) the secured party of record authorizes the filing; or
>> (2) [circumstances inapplicable to the facts of this case].

Thus, whether the UCC-3 filing effectively terminated the Main Term Loan UCC-1 depends on whether the secured party of record, JPMorgan, authorized the filing.

## B.     *Authority to File Under Delaware UCC Article 9*

All agree that to be effective, a UCC-3 must be authorized, but the parties vigorously dispute whether JPMorgan authorized the filing in question. In JPMorgan's view, the UCC-3 filing cannot have been authorized because the Termination Agreement granted Mayer Brown authority only as to the Synthetic Lease and because no one at Mayer Brown, Simpson Thacher, General Motors, or

JPMorgan ever thought that they were authorized to terminate the Main Term Loan UCC-1 or that their actions would have that effect.

The Committee contends that focusing on the parties' goal (termination of the Synthetic Lease) misses the point. In its view, the relevant question is not whether JPMorgan authorized termination of the security interest underlying the Term Loan but whether it (even if mistakenly) authorized the act of filing the UCC-3 statement that identified that interest for termination. According to the Committee, although JPMorgan did not intend or authorize the legal result of the Main Term Loan UCC-1's termination, it did review and authorize Mayer Brown to file the UCC-3 that had that effect.

Intertwined in this appeal are two closely related questions. First, the question we certify below, is what precisely a secured lender of record must authorize for a UCC-3 termination statement to be effective: Must the secured lender authorize the termination of the particular security interest that the UCC-3 identifies for termination, or is it enough that the secured lender authorize the act of filing a UCC-3 statement that has that effect? Second, a question we will address upon receipt of the Delaware court's answer: Did JPMorgan grant to Mayer Brown the relevant authority—that is, alternatively, authority either to

14

terminate the Main Term Loan UCC-1 or to file the UCC-3 statement that identified that interest for termination?

Although the bankruptcy court below and JPMorgan on appeal tend to conflate the two questions, doing so obscures the issue. Asking whether there was "was authoriz[ation] . . . to terminate JPMorgan's security interest on the unrelated Term Loan," In re *Motors Liquidation Co.*, 486 B.R. at 617, assumes an answer to the first question and moves directly on to the second. Similarly, JPMorgan's argument that the UCC-3 filing was unauthorized because Mayer Brown did not believe it was authorized to terminate the Main Term Loan UCC-1, Appellee Br. 36–38, is unpersuasive unless one assumes that a lender must authorize termination of a particular security interest and not simply the UCC-3 filing itself.

The two questions must be taken up separately. The first, what it is that a secured lender must authorize, is an issue of statutory interpretation. The second, whether JPMorgan granted the relevant authority, requires an application of traditional principles of agency law to assess the scope of Mayer Brown's authorization. Because the first question is an issue of first impression in the interpretation of Delaware UCC Article 9 and may be determinative of the

15

appeal, we certify the question to the Delaware Supreme Court. Upon receipt of the Delaware court's answer, we will address the second question of whether JPMorgan authorized Mayer Brown to take the relevant action.

**1.    Question for Certification: What Must a Secured Lender Authorize?**

As explained above, the efficacy of UCC-3 amendments is governed by Delaware's version of the UCC Article 9. Revised Article 9 eliminated the requirement that secured lenders authorize UCC-3 amendments by signature and now gives effect to records filed by anyone at all, as long as "the secured party of record authorizes the filing." U.C.C. § 9-509(d)(1). However, the section does not address what exactly it means to "authorize a filing." Is it enough that a secured lender authorize the act of filing a particular UCC-3 termination statement? Or must the secured lender authorize the termination of the particular security interest identified for termination on that UCC-3? Ordinarily the two go hand in hand. But not always, and perhaps not here.

In support of the first interpretation, the Committee references the language of UCC Article 9, which requires that a secured lender authorize a person to "file" particular "records," not that a lender authorize a person to accomplish particular legal consequences (that is, authorization to terminate or

16

amend in some specified way a particular security interest). U.C.C. § 9-509(d)(1)

provides that "[a] person may file [a termination or certain other amendments]

. . . if: (1) the secured party of interest authorizes the filing." As to a filed record's

effectiveness, U.C.C. § 9-510(a) provides that "[a] filed record is effective only to

the extent that it was filed by a person that may file it under Section 9-509."

Based on this language the Committee concludes that what UCC Article 9

requires is that the lender authorize the act of filing a particular UCC-3

termination statement.

JPMorgan understands the authorization requirement differently. In its

view, authority to file pursuant to UCC Article 9 depends on the goals of the

secured lender and the authority it has granted in pursuit of those goals.

JPMorgan reasons that it cannot have granted Mayer Brown authority to file the

UCC-3 that identified the Main Term Loan UCC-1 for termination because

JPMorgan neither intended to terminate the security interest underlying the

Main Term Loan nor authorized Mayer Brown to do so. Under this view, a

lender's authorization to file a UCC-3 termination statement would require its

authorization to effect the legal result of that filing— termination of the specified

UCC-1.

17

Because the authorization language of UCC Article 9 was added only in 2001, and because the large majority of UCC-3 filings are undisputedly authorized, relatively few courts have been called upon to interpret what precisely a secured lender must authorize. Most helpful are In re *A.F. Evans Co.*, No. 09–41727 EDJ, 2009 WL 2821510 (Bankr. N.D. Cal. Jul. 14, 2009) and *Ward v. Bank of Granite & Hickory Printing Solutions, LLC (*In re *Hickory Printing Group, Inc.)*, 479 B.R. 388 (Bankr. W.D.N.C. 2012).

In re *A.F. Evans Co.* involved a debtor that wished to sell two partnership interests it owned that were encumbered by security interests held by City National Bank ("CNB"). 2009 WL 2821510, at *1. The debtor offered to repay a portion of its debts and requested that CNB release its interests in the two partnerships (but not its interest in a third partnership that the debtor did not plan to sell). To facilitate the closing, the debtor prepared two draft UCC-3 amendments that removed the two partnerships from the collateral covered by CNB's UCC-1. CNB approved the draft UCC-3s, which were submitted to an escrow agent for filing. Sometime before filing, however, the escrow agent mistakenly added checkmarks to UCC-3 Box 2, the termination box. With Box 2 checked, the forms indicated that the entire UCC-1—and by extension CNB's

interest in all three partnerships—should be terminated, rather than that the UCC-1 should be modified to relinquish CNB's interest in only two of the partnerships.

In concluding that CNB's security interest in the third property had not been terminated by these UCC-3 filings, the United States Bankruptcy Court for the Northern District of California noted that the UCC-3s that CNB reviewed had not borne the mistaken checkmarks and reasoned that the escrow agent had not been authorized to file a UCC-3 in a form other than that approved and to thereby terminate CNB's entire security interest. *Id.* at *3–4. However, because the error was introduced by the escrow agent *after* the lender reviewed the UCC-3s, the court had no reason to reach the critical issue in this case: whether the lender's review and approval of the UCC-3s bearing the mistake would have provided the "authorization to file" required to make the UCC-3 records effective.

In *Ward*, when a debtor paid off a portion of a loan secured by an interest in his property, an employee of the lender, Granite Bank, inadvertently filed a UCC-3 statement terminating the bank's entire security interest, rather than amending its interest to reflect the amount the debtor had repaid. *See* 479 B.R. at

19

391–93. The United States Bankruptcy Court for the Western District of North Carolina reasoned that the lender was bound by the filing, despite its unintended effect, because the bank had authorized the employee to file UCC-3 records on its behalf. In applying U.C.C. § 9-509(d)(1)'s authorization requirement, the court focused entirely on whether the bank had authorized the employee to file the record, not whether the bank had authorized the employee to terminate the particular security interest. *See id.* at 396–97. However, the court articulated no rationale for taking this approach because, by the summary judgment hearing, the bank had conceded the authorization issue.[2]

Although these cases are helpful, neither they nor the other cases cited by the parties squarely address the precise question at issue in this case. We have regularly deferred to the views of state high courts in areas of first impression and elect to do so here rather than make a pronouncement on an important issue of Delaware law. Because the case presents a question of first impression that "seem[s] likely to recur and to have significance beyond the interests of the

---

[2] JPMorgan distinguishes *Ward* on the ground that it involved a simple employer-employee relationship rather than the more complex agency relationship at issue in this case. *See* Appellee Br. 35 n.8. But the relationship between the secured lender and the individual who files the UCC-3 goes to the question of whether authorization was provided, not what it is that Article 9 requires a secured lender to authorize.

parties in a particular lawsuit," *Kidney v. Kolmar Labs., Inc.*, 808 F.2d 955, 957 (2d Cir. 1987), we certify to the Delaware Supreme Court the following question:

> **Under UCC Article 9, as adopted into Delaware law by Del. Code Ann. tit. 6, art. 9, for a UCC-3 termination statement to effectively extinguish the perfected nature of a UCC-1 financing statement, is it enough that the secured lender review and knowingly approve for filing a UCC-3 purporting to extinguish the perfected security interest, or must the secured lender intend to terminate the particular security interest that is listed on the UCC-3?**

The important and urgent reason for an immediate determination by the Delaware Supreme Court of the question certified above is that the question is one of first instance in the State of Delaware. *See* Del. Sup. Ct. R. 41.

In accordance with Rule 41, it is recommended that briefs be filed in the Delaware Supreme Court in the following order:

| | |
|---|---|
| *Opening Brief:* | Plaintiff-Appellant Official Committee of Unsecured Creditors of Motors Liquidation Company |
| *Responding Brief:* | Defendant-Appellee JPMorgan Chase Bank, N.A. |
| *Reply Brief:* | Plaintiff-Appellant Official Committee of Unsecured Creditors of Motors Liquidation Company |

## 2. Whether Authorization Occurred

The Delaware Supreme Court's clarification as to the sense in which a secured party of record must authorize a UCC-3 filing will enable us to address the second question presented by this appeal—whether JPMorgan in fact

21

provided that authorization. Upon receipt of the Delaware court's response, we will address alternatively whether the filing of the UCC-3 record or termination of the Main Term Loan UCC-1 was within the scope of authority that JPMorgan granted to Mayer Brown.

## CONCLUSION

For the reasons stated, we certify the above question to the Delaware Supreme Court. Upon receipt of the Delaware court's response to the certified question, jurisdiction will automatically be restored to this Court to resolve all remaining issues as needed; the returned appeal will be assigned to this panel.