IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF MOTORS LIQUIDATION COMPANY, | § § § | No. 325, 2014 |
| | § | |
| Plaintiff-Appellant, | § § | Certification of Question of Law from the United States |
| v. | § § § | Court of Appeals for the Second Circuit |
| JPMORGAN CHASE BANK, N.A., Individually and as Administrative Agent for various lenders party to the Term Loan Agreement described herein, | § § § § § | C.A. No. 13-2187-bk |
| | § | |
| Defendant-Appellee. | § | |

Submitted:  October 8, 2014
Decided:  October 17, 2014


Before **STRINE**, Chief Justice; **HOLLAND** and **RIDGELY**, Justices; **LASTER**, Vice Chancellor;[*] and **COONIN**, Judge,[*] constituting the Court *en Banc*.

Upon Certification of Question of Law from the United States Court of Appeals for the Second Circuit.  **CERTIFIED QUESTION ANSWERED.**

Norman M. Powell, Esquire, Elena C. Norman, Esquire, John J. Paschetto, Esquire, Richard J. Thomas, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; Eric B. Fisher, Esquire (*argued*), Barry N. Seidel, Esquire, Katie L. Weinstein, Esquire, Dickstein Shapiro LLP, New York, New York; Jeffrey Rhodes, Esquire, Dickstein Shapiro LLP, Washington, District of Columbia, for Plaintiff-Appellant.

Gregory P. Williams, Esquire (*argued*), Brock E. Czeschin, Esquire, Susan M. Hannigan, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware; John M. Callagy, Esquire, Nicholas J. Panarella, Esquire, Martin A. Krolewski, Esquire, Kelley Drye & Warren LLP, New York, New York; Steven O. Weise, Esquire, Proskauer Rose LLP, Los Angeles, California, for Defendant-Appellee.

---

[*] Sitting by designation under Del. Const. art. IV, § 12.

Francis A. Monaco, Jr., Esquire, Ryan C. Cicoski, Esquire, Womble Carlyle Sandridge & Rice LLP, Wilmington, Delaware; Richard M. Kohn, Esquire, Jonathan N. Helfat, Esquire, Commercial Finance Association, for *Amicus Curiae* Commercial Finance Association.

**STRINE**, Chief Justice:

# I. INTRODUCTION

The United States Court of Appeals for the Second Circuit ("Second Circuit") has certified the following question of law important to a dispute pending before it:

> Under UCC Article 9, as adopted into Delaware law by Del. Code Ann. tit. 6, art. 9, for a UCC-3 termination statement to effectively extinguish the perfected nature of a UCC-1 financing statement, is it enough that the secured lender review and knowingly approve for filing a UCC-3 purporting to extinguish the perfected security interest, or must the secured lender intend to terminate the particular security interest that is listed on the UCC-3?[1]

We more precisely answer by assuming that by the term "effectively extinguish," the Second Circuit asks whether reviewing the termination statement and knowingly approving it for filing has the effect specified in § 9-513 of the Delaware's version of the Uniform Commercial Code ("UCC"), which is that "the financing statement to which the termination statement relates ceases to be effective."[2]  Based on that understanding and for reasons we explain more fully, the unambiguous provisions of Delaware's UCC dictate that the answer is that "it [is] enough that the secured lender review and knowingly approve for filing a UCC-3 purporting to extinguish the perfected security interest."[3]  Under the Delaware UCC, parties in commerce are entitled to rely upon a filing authorized by a secured lender and assume that the secured lender intends the plain consequences of its filing.

---

[1] *In re: Motors Liquidation Co.*, 755 F.3d 78, 86 (2d Cir. 2014).
[2] 6 *Del. C.* § 9-513(d).
[3] *Id.*

1

## II.  THE EVENTS LEADING TO THE CERTIFIED QUESTION

The dispute pending before the Second Circuit turns on the effect of a UCC termination statement – a "UCC-3 termination statement" – filed with the Delaware Secretary of State on behalf of General Motors Corporation.[4]  That termination statement, by its plain terms, purported to extinguish a security interest on the assets of General Motors ("term loan security interest") held by a syndicate of lenders, including JPMorgan Chase Bank, N.A. ("JPMorgan").  But neither JPMorgan nor General Motors subjectively intended to terminate the term loan security interest when General Motors filed the termination statement.  General Motors' counsel for a separate "synthetic lease" financing transaction, Mayer Brown LLP, had inadvertently included the term loan security interest on the termination statement that it filed in the process of unwinding the synthetic lease.  According to JPMorgan, no one at General Motors, Mayer Brown, or Simpson Thatcher Bartlett LLP (JPMorgan's counsel for the synthetic lease transaction) noticed this error, even though individuals at each organization reviewed the filing statement before the termination statement was filed on October 30, 2008.  Under the stipulated question, we are also to assume that JPMorgan itself reviewed the termination statement and knowingly approved its filing.

After General Motors filed for reorganization under Chapter 11 of the Bankruptcy Code, JPMorgan informed the unofficial committee of unsecured creditors ("Creditors Committee") that a UCC-3 termination statement relating to the term loan had been

---

[4] These factual details are taken from the Second Circuit's opinion certifying the question of law to this Court and from the appendices submitted by the parties.

inadvertently filed. On July 31, 2009, the Creditors Committee commenced a proceeding against JPMorgan in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), seeking, among other things, a determination that the filing of the UCC-3 termination statement was effective to terminate the term loan security interest and thus render JPMorgan an unsecured creditor on par with the other General Motors unsecured creditors. JPMorgan contested that argument, asserting that it had not authorized the termination statement releasing the term loan security interest, and that the statement was erroneously filed because no one at General Motors, JPMorgan, or the law firms working on the synthetic lease transaction recognized that the unrelated term loan security interest had been included on the statement.

On cross-motions for summary judgment, the Bankruptcy Court found for JPMorgan on various grounds, including that JPMorgan had not empowered Mayer Brown to act as its agent in releasing the term loan security interest in the sense that it had only authorized Mayer Brown to file an accurate termination statement that released security interests properly related to the synthetic lease transaction.[5] Because neither JPMorgan nor General Motors intended the legal consequences of the UCC-3 termination statement, the Bankruptcy Court found that the UCC-3 filing was not authorized and therefore was not effective to terminate the term loan security interest.[6]

The Creditors Committee appealed to the Second Circuit, arguing, among other things, that Mayer Brown was authorized as JPMorgan's agent to file the UCC-3

---

[5] *Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, 486 B.R. 596, 606 (Bankr. S.D.N.Y. 2013).
[6] *Id.*

termination statement. Most pertinent for present purposes, the Creditors Committee argued that the only issue is whether JPMorgan had authorized the *filing* of the UCC-3 termination statement. So long as JPMorgan had authorized the statement to be filed, the termination of all identified security interests, including the term loan security interest, would be effective.

The Creditors Committee also contended that JPMorgan's argument that a party can authorize a filing and then later claim that it had not authorized the filing because it failed to catch an error in the statement is inconsistent with the plain language of § 9-513 of Delaware's UCC. That language states in pertinent part that "upon the filing of a termination statement with the filing office, the financing statement to which the termination statement relates ceases to be effective."[7]

By contrast, JPMorgan took the position that a party may authorize a specific document to be filed on its behalf, but that such authorization does not cause the termination statement to be effective if errors in the statement resulted in the release of a security interest that the party did not subjectively intend to release.

The Second Circuit has indicated that it would be helpful to have an answer from this Court regarding this aspect of the parties' dispute. That answer may avoid any need for the Second Circuit to address the parties' disagreement as to whether Mayer Brown was authorized to act as JPMorgan's agent to file the UCC-3 termination statement, or provide some useful clarity if the agency issue must be addressed. Accordingly, the Second Circuit has certified the following question:

_____

[7] 6 *Del. C.* § 9-513(d).

4

> Under UCC Article 9, as adopted into Delaware law by Del. Code Ann. tit. 6, art. 9, for a UCC-3 termination statement to effectively extinguish the perfected nature of a UCC-1 financing statement, is it enough that the secured lender review and knowingly approve for filing a UCC-3 purporting to extinguish the perfected security interest, or must the secured lender intend to terminate the particular security interest that is listed on the UCC-3?[8]

The question is precise, and we read it as asking us to assume what it literally says, which is that the secured party of record has itself reviewed and knowingly approved the termination statement for filing. In its briefs and at oral argument, JPMorgan attempted to reframe the certified question by asking us to consider the issues of agency law that come into play whenever an entity, such as JPMorgan, acts through agents, be they employees, outside lawyers, or UCC-filing-service representatives. JPMorgan argued about whether a filing would be authorized if a secured party granted authority to an agent to file a termination statement for one security interest but not another, but the agent mistakenly filed a termination statement for both. That is not the question we have been asked to address, and the Second Circuit has said it will consider the fact-based question of whether Mayer Brown had authority as JPMorgan's agent to file the termination statement after it receives our answer to its more precise question. The question certified to us assumes that the secured party of record "review[d] and knowingly approve[d] [the termination statement] for filing." We will answer the question as our judicial colleagues have framed it.

---

[8] *In re: Motors Liquidation Co.*, 755 F.3d 78, 86 (2d Cir. 2014).

5

## III. ANALYSIS

"The most important consideration for a court in interpreting a statute is the words the General Assembly used in writing it."[9]  The provisions of Delaware's UCC that are relevant to and support our conclusion are succinct.  Section 9-513 of the UCC states:

> (d) *Effect of filing termination statement*.  Except as otherwise provided in Section 9-510, upon the filing of a termination statement with the filing office, the financing statement to which the termination statement relates ceases to be effective.[10]

In turn, § 9-510 makes plain that a termination statement is effective only if the statement was filed by a person who is entitled to do so under § 9-509:

> (a) *Filed record effective if authorized*.  A filed record is effective only to the extent that it was filed by a person that may file it under Section 9-509.[11]

The final step in the relevant statutory chain is § 9-509(d)(1), which addresses who may file amendments, which include termination statements:[12]

> (d) *Person entitled to file certain amendments*.  A person may file an amendment other than an amendment that adds collateral covered by a financing statement or an amendment that adds a debtor to a financing statement only if:
>     (1) the secured party of record authorizes the filing; or
>     (2) [circumstances inapplicable to the facts of this case].[13]

"[U]nambiguous statutes are not subject to judicial interpretation."[14]  The unambiguous terms of these UCC provisions make clear that if a "secured party of record

---

[9] *Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 950 (Del. Ch. 2013).
[10] 6 *Del. C.* § 9-513(d).
[11] 6 *Del. C.* § 9-509(a).
[12] *See* 6 *Del. C.* § 9-102(a)(80) (defining a "termination statement" as an "amendment of a financing statement").
[13] 6 *Del. C.* § 9-509(d)(1).

authorizes the filing [of a termination statement],"[15] then the filing is "effective"[16] "upon the filing of a termination statement with the filing office."[17]  At that time, "the statement to which the termination statement relates ceases to be effective."[18]  In other words, for a termination statement to have the effect specified under § 9-513 of the Delaware UCC, it is enough that the secured party authorizes the filing.  JPMorgan's argument that a filing is only effective if the authorizing party understands the filing's substantive terms and intends their effect is contrary to § 9-509, which only requires that "the secured party of record authorize[] the filing."[19]

This unambiguous language promotes sound policy.  It is fair for sophisticated transacting parties to bear the burden of ensuring that a termination statement is accurate when filed.[20]  It would be strange and inefficient for the UCC to make the effectiveness of a termination statement depend on whether the secured party subjectively understood

---

[14] *Leatherbury v. Greenspun, D.O.*, 939 A.2d 1284, 1288 (Del. 2007).

[15] 6 *Del. C.* § 9-509(d)(1).

[16] 6 *Del. C.* § 9-510(a).

[17] 6 *Del. C.* § 9-513(d).

[18] *Id.*

[19] *See also* U.C.C. § 9-518 cmt. ("If the person that filed the record was not entitled to do so, the filed record is ineffective, regardless of whether the secured party of record files an information statement.  Likewise, if the person that filed the record was entitled to do so, the filed record is effective, even if the secured party of record files an information statement.").

[20] *See, e.g.*, *Graham v. State Farm Mut. Auto. Ins. Co.*, 1989 WL 12233, at *2 (Del. Super. Jan. 26, 1989) ("[F]ailure to read a contract in the absence of fraud is an unavailing excuse or defense and cannot justify an avoidance, modification or nullification of the contract or any provision thereof.") (internal citation omitted); *Hicks v. Soroka*, 188 A.2d 133, 140–41 (Del. Super. 1963) ("If one voluntarily shuts his eyes when to open them is to see, such a one is guilty of an act of folly (in dealing at arm's length with another) to his own injury; and the affairs of men could not go on if courts were being called upon to rip up transactions of that sort.") (internal citation omitted).

the terms of its own filing and the effect that the filing would have on the security interests the filing's own words address.[21]

As a matter of ordinary course, parties who sign contracts and other binding documents, or authorize someone else to execute those documents on their behalf, are bound by the obligations that those documents contain.[22] Certainly, there are doctrines that allow parties who sign documents they do not understand to escape the consequences

---

[21] *See, e.g.*, *ACF 2006 Corp. v. Merritt*, 2013 WL 466603, at *4 (W.D. Okla. Feb. 7, 2013), ("Although strict adherence to the [UCC] requirements may at times lead to harsh results, efforts by courts to fashion equitable solutions for mitigation of hardships experienced by creditors in the literal application of statutory filing requirements may have the undesirable effect of reducing the degree of reliance the market place should be able to place on the [UCC] provisions. The inevitable harm doubtless would be more serious to commerce than the occasional harshness from strict obedience.") (citation omitted), *aff'd*, 557 F. App'x 747 (10th Cir. 2014); *In re Silvernail Mirror & Glass, Inc.*, 142 B.R. 987, 989 (M.D. Florida 2013) ("The Termination Statement gave all indications to the world that [the creditor] was terminating its security interest in all its collateral. The filing of a Termination Statement is a method of making the record reflect the true state of affairs so that fewer inquiries will have to be made by persons who consult the public records. . . . [E]ven if [a] Termination Statement did not reflect the parties' true intent, it would be materially misleading to a potential creditor relying on the public records [to ignore the statement] and therefore [it] should not be set aside.").

[22] *See* 11 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 31.5 (4th ed. 2003) ("As a general principle, all adults are presumed to be capable of managing their own affairs, and the question whether a bargain is smart or foolish, or economically efficient or disastrous, is not ordinarily a legitimate subject of judicial inquiry. If freedom of contract means anything, it means that parties may make even foolish bargains and should be held to the terms of their agreements. A contract is not a non-binding statement of the parties' preferences; rather, it is an attempt by market participants to allocate risks and opportunities. [The court's role] is not to redistribute these risks and opportunities as [it sees] fit, but to enforce the allocation the parties have agreed upon. While the parties to a contract often request the courts, under the guise of interpretation or construction, to give their agreement a meaning which cannot be found in their written understanding, based entirely on direct evidence of intention, and often on hindsight, the courts properly and steadfastly reiterate the well-established principle that it is not the function of the judiciary to change the obligations of a contract which the parties have seen fit to make. . . . Unless the contract is voidable due to mistake, fraud, unconscionability, or another invalidating cause, or invalid in whole or in part due to illegality or another violation of public policy, the court must enforce it as drafted by the parties, according to the terms employed. . . .").

in certain circumstances, such as mutual mistake or reformation.[23] But as the Creditors Committee points out, had the General Assembly wished to give secured parties who authorize filings a safety valve against their own failure to comprehend the terms of their filings, it could have written § 9-509(d)(1) to state, for example, that "a person may file [a termination statement] . . . only if . . . the secured party of record authorizes the filing *and intends to terminate the security interests identified in that filing.*" Or the General Assembly could have provided that the secured party must "authorize and *understand the filing.*" The General Assembly did not write the statute in either way, and it would be improper for us to engraft such a condition on § 9-509, especially when the statutory language is unambiguous.[24]

Even if the statute were ambiguous, we would be reluctant to embrace JPMorgan's proposition. Before a secured party authorizes the filing of a termination statement, it ought to review the statement carefully and understand which security interests it is releasing and why. A secured party is the master of its own termination statement; it works no unfairness to expect the secured party to review a termination statement carefully and only file the statement once it is sure that the statement is correct.[25] If

---

[23] *See e.g.*, *id*. § 70.106 (4th ed. 2003) ("A contract may be rescinded where there is a clear, bona fide, mutual mistake regarding a material fact or law."); *id*. § 70.20-21 ("Reformation of a written instrument is available where, because of a mutual mistake of fact, the instrument fails to express the real agreement between the parties.").

[24] *See Stifel Fin. Corp. v. Cochran*, 809 A.2d 555, 560 (Del. 2002) ("[T]his court should be chary about reading words into a statute that the General Assembly could have easily added itself.") (quoting *HMG/Courtland Props.*, *Inc. v. Gray*, 729 A.2d 300, 306 (Del. Ch. 1999)).

[25] If a party files a termination statement that is inaccurate, it may follow the procedure established by the UCC to correct the record. Section 9-518 of Delaware's UCC authorizes a person to file an "information statement" (or a "correction statement" under the UCC) if the person believes that the existing record is inaccurate or a statement has been wrongly filed.

parties could be relieved from the legal consequences of their mistaken filings, they would have little incentive to ensure the accuracy of the information contained in their UCC filings.

We recognize that the UCC is a system of notice filing and that such a system contemplates that later lenders may need to conduct diligence to determine that a filing was authorized by the secured party of record. But consistent with the purpose of setting up a notice system, one of the most important roles the UCC plays is facilitating the efficient procession of commerce by permitting parties to rely in good faith on the plain terms of authorized public filings.[26] The UCC thus enables the crafting of contractual arrangements that generate wealth and the investment of capital in commercial enterprise because parties are able to rely on a clear and predicable set of rules to govern their transactions.[27]

To hold that parties cannot rely upon authorized filings unless the secured party subjectively understood the effect of its own action would disrupt and undermine the

---

6 *Del. C.* § 9-518. The information statement has no legal effect in terms of restoring the filing statement. But it does give public notice that the erroneously filed record is unreliable. *See id.*; 11 ANDERSON U.C.C. § 9-518:5 (3d. ed. 2013). To restore the security interest its mistaken filing released, the secured party must perfect the security interest anew by filing a new financing statement. *See, e.g.*, *U.S. v. Lincoln Sav. Bank (In re Commercial Millwright)*, 245 B.R. 597, 601 (Bankr. N.D. Iowa 1999).

[26] *See, e.g.*, WEST'S ALR DIGEST SECURED TRANSACTIONS § 82.1 (2014) ("The purpose of the filing requirements for perfection of security interests is to guarantee that third parties will have notice of existing security interests in collateral, thus protecting credit transactions."); *U.S. v. Lincoln Sav. Bank (In re Commercial Millwright)*, 245 B.R. 597, 601 (Bankr. N. D. Iowa 1999) ("Perfection is intended to protect outside parties by providing clear notice.").

[27] *See, e.g.*, *In re Hickory Printing Group, Inc.*, 479 B.R. 388, 397 (Bankr. W.D.N.C. 2012) ("Lenders are bound by the effects of UCC termination statements, even when such termination statements are filed in error, because the entire purpose of the UCC system is to provide public notice of secured interests without requiring the parties to look behind or beyond the four corners of the public filing.").

secured lending markets. It is not clear to us how an inquiring party would find out whether a secured party understood and intended the consequences of its own filing. In the normal course of business, which is what the Delaware UCC embraces as appropriate policy, a party who causes a document to be executed and filed on its behalf is expected to understand what the filing says, the effect the filing will have, and that its own act of causing the document to be executed and filed will signal to others that the filing party subjectively intends for the filing to have the effect resulting from plain terms.[28] If we were to embrace JPMorgan's theory, no creditor could ever be sure that a UCC-3 filing is truly effective, even where the secured party itself authorized the filing, unless a court determined after costly litigation that the filing was in fact subjectively intended.

It therefore may not be coincidental that JPMorgan did not confront the language of the UCC directly, but instead devoted most of its answering brief and the bulk of its presentation during oral argument to addressing a question that is not before us. In its brief, JPMorgan dilated mostly on whether General Motors (and its counsel Mayer Brown) was authorized to act as JPMorgan's agent in filing the UCC-3 Termination Statement.[29] But the Second Circuit has asked us to assume that the secured party itself—JPMorgan—"*review[ed] and knowingly approved* for filing a UCC-3 purporting

---

[28] *See, e.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 157 (1981) ("Generally, one who assents to a writing is presumed to know its contents and cannot escape being bound by its terms merely by contending that he did not read them; his assent is deemed to cover unknown as well as known terms."); s*ee also In re Lortz*, 344 B.R. 579, 585 (Bankr. C.D. Ill. 2006) ("As with all perfection laws, which focus on third party perceptions and clarity and certainty of notice, the intent of the secured party is not relevant to questions of perfection and errors can be fatal."); *In re Clean Burn Fuels, LLC*, 492 B.R. 445, 465 (Bankr. M.D.N.C. 2013) ("The [UCC] permits third parties to rely on the record to determine whether a perfected security interest exists.").
[29] *See* Answering Br. at 18-24.

11

to extinguish the perfected security interest." We accept that assumption and refuse JPMorgan's invitation to answer a separate, fact-laden question that is not properly before us. As the Second Circuit made clear, it will address that issue itself after it receives the answer to the narrow question put to us.

Thus, for the reasons we have articulated, for a termination statement to become effective under § 9-509 and thus to have the effect specified in § 9-513 of the Delaware UCC, it is enough that the secured party authorizes the filing to be made, which is all that § 9-510 requires. The Delaware UCC contains no requirement that a secured party that authorizes a filing subjectively intends or otherwise understands the effect of the plain terms of its own filing. The Clerk is directed to transmit this opinion to the Second Circuit.