13-2187
*In Re: Motors Liquidation Co.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2013

(Argued: March 25, 2014                Question Certified: June 17, 2014
Question Answered: October 17, 2014        Appeal Decided: January 21, 2015)

Docket No. 13-2187

In Re: MOTORS LIQUIDATION COMPANY, et al.,

*Debtor*,

---

OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF MOTORS
LIQUIDATION COMPANY,

*Plaintiff-Appellant*,

-v.-

JP MORGAN CHASE BANK, N.A., individually and as Administrative Agent
for various lenders party to the Term Loan Agreement described herein,

*Defendant-Appellee.*

---

Before:

WINTER, WESLEY, AND CARNEY, *Circuit Judges.*

Direct appeal pursuant to 28 U.S.C. § 158(d)(2) from an order of the United States Bankruptcy Court for the Southern District of New York (Gerber, U.S.B.J.) holding that a mistaken UCC-3 termination statement was unauthorized and therefore not effective to terminate a secured lender's interest in a debtor's property. We conclude that although the termination statement mistakenly identified for termination a security interest that the lender did not intend to terminate, the secured lender authorized the filing of the document, and the termination statement was effective to terminate the security interest. REVERSED and REMANDED.

ERIC B. FISHER (Barry N. Seidel, Katie L. Weinstein, Jeffrey Rhodes, *on the brief*), Dickstein Shapiro LLP, New York, NY, *for Plaintiff-Appellant*.

JOHN M. CALLAGY (Nicholas J. Panarella, Martin A. Krolewski, *on the brief*), Kelley Drye & Warren LLP, New York, NY, *for Defendant-Appellee*.

PER CURIAM:

We assume familiarity with our prior certification opinion, *Official Committee of Unsecured Creditors of Motors Liquidation Co. v. JP Morgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, 755 F.3d 78 (2d Cir. 2014), and the resulting decision of the Delaware Supreme Court, *Official Committee of Unsecured Creditors*

*of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A.*, ___ A.3d ___, 2014 WL

5305937 (Del. Oct. 17, 2014).  We restate the most salient facts.[1]

## BACKGROUND

In October 2001, General Motors entered into a synthetic lease financing

transaction (the "Synthetic Lease"), by which it obtained approximately $300

million in financing from a syndicate of lenders including JPMorgan Chase Bank,

N.A. ("JPMorgan").  General Motors' obligation to repay the Synthetic Lease was

secured by liens on twelve pieces of real estate.  JPMorgan served as

administrative agent for the Synthetic Lease and was identified on the UCC-1

financing statements as the secured party of record.

Five years later, General Motors entered into a separate term loan facility

(the "Term Loan").  The Term Loan was entirely unrelated to the Synthetic Lease

and provided General Motors with approximately $1.5 billion in financing from

a different syndicate of lenders.  To secure the loan, the lenders took security

interests in a large number of General Motors' assets, including all of General

Motors' equipment and fixtures at forty-two facilities throughout the United

---

[1] These undisputed facts are drawn from the record and from the Bankruptcy Court's decision below, *Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, 486 B.R. 596 (Bankr. S.D.N.Y. 2013).

States.  JPMorgan again served as administrative agent and secured party of record for the Term Loan and caused the filing of twenty-eight UCC-1 financing statements around the country to perfect the lenders' security interests in the collateral.  One such financing statement, the "Main Term Loan UCC-1," was filed with the Delaware Secretary of State and bore file number "6416808 4."  It "covered, among other things, all of the equipment and fixtures at 42 GM facilities, [and] was by far the most important" of the financing statements filed in connection with the Term Loan.  *Official Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, 486 B.R. 596, 603 n.6 (Bankr. S.D.N.Y. 2013).

In September 2008, as the Synthetic Lease was nearing maturity, General Motors contacted Mayer Brown LLP, its counsel responsible for the Synthetic Lease, and explained that it planned to repay the amount due.  General Motors requested that Mayer Brown prepare the documents necessary for JPMorgan and the lenders to be repaid and to release the interests the lenders held in General Motors' property.

A Mayer Brown partner assigned the work to an associate and instructed him to prepare a closing checklist and drafts of the documents required to pay

4

off the Synthetic Lease and to terminate the lenders' security interests in General Motors' property relating to the Synthetic Lease. One of the steps required to unwind the Synthetic Lease was to create a list of security interests held by General Motors' lenders that would need to be terminated. To prepare the list, the Mayer Brown associate asked a paralegal who was unfamiliar with the transaction or the purpose of the request to perform a search for UCC-1 financing statements that had been recorded against General Motors in Delaware. The paralegal's search identified three UCC-1s, numbered 2092532 5, 2092526 7, and 6416808 4. Neither the paralegal nor the associate realized that only the first two of the UCC-1s were related to the Synthetic Lease. The third, UCC-1 number 6416808 4, related instead to the Term Loan.

When Mayer Brown prepared a Closing Checklist of the actions required to unwind the Synthetic Lease, it identified the Main Term Loan UCC-1 for termination alongside the security interests that actually did need to be terminated. And when Mayer Brown prepared draft UCC-3 statements to terminate the three security interests identified in the Closing Checklist, it prepared a UCC-3 statement to terminate the Main Term Loan UCC-1 as well as those related to the Synthetic Lease.

5

No one at General Motors, Mayer Brown, JPMorgan, or its counsel,

Simpson Thacher & Bartlett LLP, noticed the error, even though copies of the

Closing Checklist and draft UCC-3 termination statements were sent to

individuals at each organization for review. On October 30, 2008, General

Motors repaid the amount due on the Synthetic Lease. All three UCC-3s were

filed with the Delaware Secretary of State, including the UCC-3 that erroneously

identified for termination the Main Term Loan UCC-1, which was entirely

unrelated to the Synthetic Lease.

## A.    *General Motors' Chapter 11 Bankruptcy Filing*

The mistake went unnoticed until General Motors' bankruptcy in 2009.

After General Motors filed for chapter 11 reorganization, JPMorgan informed the

Committee of Unsecured Creditors (the "Committee") that a UCC-3 termination

statement relating to the Term Loan had been inadvertently filed in October

2008. JPMorgan explained that it had intended to terminate only liens related to

the Synthetic Lease and stated that the filing was therefore unauthorized and

ineffective.

On July 31, 2009, the Committee commenced the underlying action against

JPMorgan in the United States Bankruptcy Court for the Southern District of

6

New York.  The Committee sought a determination that, despite the error, the

UCC-3 termination statement was effective to terminate the Term Loan security

interest and render JPMorgan an unsecured creditor on par with the other

General Motors unsecured creditors.  JPMorgan disagreed, reasoning that the

UCC-3 termination statement was unauthorized and therefore ineffective

because no one at JPMorgan, General Motors, or their law firms had intended

that the Term Loan security interest be terminated.  On cross-motions for

summary judgment, the Bankruptcy Court concluded that the UCC-3 filing was

unauthorized and therefore not effective to terminate the Term Loan security

interest.  *In re Motors Liquidation Co.*, 486 B.R. at 647–48.

## B.     *Prior Certification Opinion*

On appeal to this Court, the parties offered competing interpretations of

UCC § 9-509(d)(1), which provides that a UCC-3 termination statement is

effective only if "the secured party of record authorizes the filing."  JPMorgan

reasoned that it cannot have "authorize[d] the filing" of the UCC-3 that

identified the Main Term Loan UCC-1 for termination because JPMorgan neither

intended to terminate the security interest nor instructed anyone else to do so on

its behalf.  In response, the Committee contended that focusing on the parties'

7

goal misses the point. It interpreted UCC § 9-509(d)(1) to require only that the secured lender authorize the act of filing a particular UCC-3 termination statement, not that the lender subjectively intend to terminate the particular security interest identified for termination on that UCC-3. The Committee further argued that even if JPMorgan never intentionally instructed anyone to terminate the Main Term Loan UCC-1, JPMorgan did literally "authorize[] the filing"—even if mistakenly—of a UCC-3 termination statement that had that effect.

In our prior certification opinion we recognized that this appeal presents two closely related questions. First, what precisely must a secured lender of record authorize for a UCC-3 termination statement to be effective: "Must the secured lender authorize the termination of the particular security interest that the UCC-3 identifies for termination, or is it enough that the secured lender authorize the act of filing a UCC-3 statement that has that effect?" *In re Motors Liquidation Co.*, 755 F.3d at 84. Second, "[d]id JPMorgan grant to Mayer Brown the relevant authority—that is, alternatively, authority either to terminate the Main Term Loan UCC-1 or to file the UCC-3 statement that identified that interest for termination?" *Id.*

8

Recognizing that the first question—what is it that the UCC requires a secured lender to authorize—seemed likely to recur and presented a significant issue of Delaware state law, we certified to the Delaware Supreme Court the following question:

> Under UCC Article 9, as adopted into Delaware law by Del. Code Ann. tit. 6, art. 9, for a UCC-3 termination statement to effectively extinguish the perfected nature of a UCC-1 financing statement, is it enough that the secured lender review and knowingly approve for filing a UCC-3 purporting to extinguish the perfected security interest, or must the secured lender intend to terminate the particular security interest that is listed on the UCC-3?

*Id.* at 86. The second question—whether JPMorgan granted the relevant authority—we reserved for ourselves, explaining that "[t]he Delaware Supreme Court's clarification as to the sense in which a secured party of record must authorize a UCC-3 filing will enable us to address . . . whether JPMorgan in fact provided that authorization." *Id.* at 86–87.

## C.    *The Delaware Supreme Court's Answer*

In a speedy and thorough reply, the Delaware Supreme Court answered the certified question, explaining that if the secured party of record authorizes the filing of a UCC-3 termination statement, then that filing is effective regardless of whether the secured party subjectively intends or understands the effect of that filing:

9

[F]or a termination statement to become effective under § 9-509 and thus to have the effect specified in § 9-513 of the Delaware UCC, it is enough that the secured party authorizes the filing to be made, which is all that § 9-510 requires. The Delaware UCC contains no requirement that a secured party that authorizes a filing subjectively intends or otherwise understands the effect of the plain terms of its own filing.

*Official Comm. of Unsecured Creditors of Motors Liquidation Co.*, 2014 WL 5305937, at *5. That conclusion, explained the court, follows both from the unambiguous terms of the UCC and from sound policy considerations:

JPMorgan's argument that a filing is only effective if the authorizing party understands the filing's substantive terms and intends their effect is contrary to § 9-509, which only requires that "the secured party of record authorize[ ] the filing."
. . .

Even if the statute were ambiguous, we would be reluctant to embrace JPMorgan's proposition. Before a secured party authorizes the filing of a termination statement, it ought to review the statement carefully and understand which security interests it is releasing and why. . . . If parties could be relieved from the legal consequences of their mistaken filings, they would have little incentive to ensure the accuracy of the information contained in their UCC filings.

*Id.* at *3–4 (first alteration in original) (footnote omitted).

## DISCUSSION

The Delaware Supreme Court has explained the sense in which a secured party must "authorize[] the filing" of a UCC-3 termination statement. What

10

remains is to answer the question we reserved for ourselves in our prior certification opinion: Did JPMorgan authorize the filing of the UCC-3 termination statement that mistakenly identified for termination the Main Term Loan UCC-1?

In JPMorgan's view, it never instructed anyone to file the UCC-3 in question, and the termination statement was therefore unauthorized and ineffective. JPMorgan reasons that it authorized General Motors only to terminate security interests related to the Synthetic Lease; that it instructed Simpson Thacher and Mayer Brown only to take actions to accomplish that objective; and that therefore Mayer Brown must have exceeded the scope of its authority when it filed the UCC-3 purporting to terminate the Main Term Loan UCC-1.

JPMorgan's and General Motors' aims throughout the Synthetic Lease transaction were clear: General Motors would repay the Synthetic Lease, and JPMorgan would terminate its related UCC-1 security interests in General Motors' properties. The Synthetic Lease Termination Agreement provided that, upon General Motors' repayment of the amount due under the Synthetic Lease, General Motors would be authorized "to file a termination of any existing

11

Financing Statement relating to the Properties [of the Synthetic Lease]." J.A. 2151. And, to represent its interests in the transaction, JPMorgan relied on Simpson Thacher, its counsel for matters related to the Synthetic Lease. No one at JPMorgan, Simpson Thacher, General Motors, or Mayer Brown took action intending to affect the Term Loan.

What JPMorgan intended to accomplish, however, is a distinct question from what actions it authorized to be taken on its behalf. Mayer Brown prepared a Closing Checklist, draft UCC-3 termination statements, and an Escrow Agreement, all aimed at unwinding the Synthetic Lease but tainted by one crucial error: The documents included a UCC-3 termination statement that erroneously identified for termination a security interest related not to the Synthetic Lease but to the Term Loan. The critical question in this case is whether JPMorgan "authorize[d] [Mayer Brown] to file" that termination statement.

After Mayer Brown prepared the Closing Checklist and draft UCC-3 termination statements, copies were sent for review to a Managing Director at JPMorgan who supervised the Synthetic Lease payoff and who had signed the Term Loan documents on JPMorgan's behalf. Mayer Brown also sent copies of

12

the Closing Checklist and draft UCC-3 termination statements to JPMorgan's counsel, Simpson Thacher, to ensure that the parties to the transaction agreed as to the documents required to complete the Synthetic Lease payoff transaction. Neither directly nor through its counsel did JPMorgan express any concerns about the draft UCC-3 termination statements or about the Closing Checklist. A Simpson Thacher attorney responded simply as follows: "Nice job on the documents. My only comment, unless I am missing something, is that all references to JPMorgan Chase Bank, as Administrative Agent for the Investors should not include the reference 'for the Investors.'" J.A. 921.

After preparing the closing documents and circulating them for review, Mayer Brown drafted an Escrow Agreement that instructed the parties' escrow agent how to proceed with the closing. Among other things, the Escrow Agreement specified that the parties would deliver to the escrow agent the set of three UCC-3 termination statements (individually identified by UCC-1 financing statement file number) that would be filed to terminate the security interests that General Motors' Synthetic Lease lenders held in its properties. The Escrow Agreement provided that once General Motors repaid the amount due on the Synthetic Lease, the escrow agent would forward copies of the UCC-3

termination statements to General Motors' counsel for filing. When Mayer

Brown e-mailed a draft of the Escrow Agreement to JPMorgan's counsel for

review, the same Simpson Thacher attorney responded that "it was fine" and

signed the agreement.

From these facts it is clear that although JPMorgan never intended to

terminate the Main Term Loan UCC-1, it authorized the filing of a UCC-3

termination statement that had that effect. "Actual authority . . . is created by a

principal's manifestation to an agent that, as reasonably understood by the agent,

expresses the principal's assent that the agent take action on the principal's

behalf." Restatement (Third) of Agency § 3.01 (2006); *accord Demarco v. Edens*, 390

F.2d 836, 844 (2d Cir. 1968). JPMorgan and Simpson Thacher's repeated

manifestations to Mayer Brown show that JPMorgan and its counsel knew that,

upon the closing of the Synthetic Lease transaction, Mayer Brown was going to

file the termination statement that identified the Main Term Loan UCC-1 for

termination and that JPMorgan reviewed and assented to the filing of that

statement. Nothing more is needed.

14

**CONCLUSION**

For the foregoing reasons, we REVERSE the Bankruptcy Court's grant of summary judgment for the Defendant and REMAND with instructions to the Bankruptcy Court to enter partial summary judgment for the Plaintiff as to the termination of the Main Term Loan UCC-1.