# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| NAVIENT SOLUTIONS, LLC, | ) | |
| | ) | |
| Plaintiff/Counterclaim | ) | |
| Defendant, | ) | C.A. No.: N20C-04-005 KMM |
| | ) | |
| v. | ) | |
| | ) | |
| BPG OFFICE PARTNERS XIII IRON | ) | |
| HILL LLC; OFFICE PARTNERS XIII | ) | |
| IRON HILL LLC, | ) | |
| | ) | |
| Defendants/Counterclaim | ) | |
| Plaintiffs. | ) | |

Date submitted: January 24, 2024

Date decided: April 22, 2024

## OPINION

Non-Party Intervenor BVFL I FI LLC's Motion to Quash Plaintiff's Writ of
Attachment *Fieri Facias*: **GRANTED in part**

R. Karl Hill, Esq. (*argued*), Seitz, Van Ogtrop & Green, P.A., Wilmington,
Delaware, *Attorney for Plaintiff/Counterclaim Defendant Navient Solutions, LLC*.

Jeffrey M. Weiner, Esq., Law Offices of Jeffrey M. Weiner, Wilmington,
Delaware, *Attorney for Defendants/Counterclaim Plaintiffs BPG Office Partners
XIII Iron Hill LLC and Office Partners XIII Iron Hill LLC*.

Michael V. DiPietro, Esq., Christina B. Vavala, Esq., Polsinelli PC, Wilmington,
Delaware; Bradley R. Gardner, Esq., (*pro hac vice*) (*argued*), Abigail E. Williams,
Esq. (*pro hac vice*), Polsinelli PC, Kansas City, Missouri, *Attorneys for Intervenor
BVFL I FI LLC*.

**MILLER, J**

## I.    Introduction

Defendants BPG Office Partners XIII Iron Hill LLC and Office Partners XIII Iron Hill LLC (together, "BPG") are the owners of a commercial building and borrowers under loan documents with BVFL I FI LLC ("Lender"). Navient Solutions, LLC ("Navient") was a tenant in the building. After Navient left the premises, it initiated this action to collect money owed to it by BPG under the lease.

After Navient obtained a judgment, it caused writs of garnishment to be served on the tenants in the building to attempt to collect on its judgment. Lender, which has a prior perfected security interest in the property and the rents, intervened and moved to quash the writs based on its priority status as a secured creditor.

While acknowledging that Lender has a prior perfected lien, Navient argues that a default has not occurred and therefore, Lender has no right to the rents and thus, no basis to quash the writs. Alternatively, if a default has occurred, Navient argues that Lender must do more than just declare a default in order to preserve its priority status. Relying on cases from Florida and Illinois, Navient asserts that because Lender did not take steps to exercise it rights and remedies after the judgment was entered, it cannot prevent the funds from being garnished.

Lender responds that a default has occurred and while it is not required to do anything more to preserve its priority status, it did, in fact, do more. Among other things, it declared a default and accelerated the balance of the loan. Relying on a

1

case from Michigan, Lender asserts that its collateral cannot be garnished and it is not required to take any steps to preserve its priority rights.

The line of cases relied on by Navient adopt what is known as the "use-it-or-lose-it" approach. Under this theory, if, after a default, a secured creditor does not take steps to enforce its rights prior to service of writs of garnishment, the lien creditor will prime the secured creditor. Courts that have followed this approach essentially find a constructive waiver by the secured creditor's inaction.

The counter approach is known as "trace and recapture." Under this theory, a secured creditor does not waive its priority status merely by inaction after a default occurs. If, after a default, the secured creditor takes no action to enforce its remedies and a writ of garnishment is served, the funds may properly be delivered to the lien creditor. However, the garnished funds are subject to the secured creditor's interest and when the secured creditor decides to enforce its remedies, it may "recapture" the funds from the lien creditor.

No Delaware case has addressed whether a secured party must, after a default, take action to preserve its priority status in the face of a junior creditor attaching its collateral. Thus, it is an issue of first impression in Delaware. The Court finds that the trace and recapture approach is consistent with the rights that attach when a writ of garnishment is served, the policies and provisions of the Uniform Commercial Code (the "UCC"), the terms of the loan documents between Lender and BPG, and

Delaware's policy of freedom of contract. Thus, a secured party is not required to exercise its rights and remedies after a default to preserve its priority status.

As detailed below, a default occurred before Navient's writs of garnishment were served. While Lender did not immediately take affirmative steps to collect on its collateral, it did not need to do so to preserve its priority status. In any event, Lender did take steps to enforce its rights before the writs were served. Lender declared a default, accelerated the loan, and expressly revoked BPG's license to the rents.

Navient requests that if Lender is found to have a priority status, the Court quash the writs only to the extent necessary to allow BPG to satisfy its monthly loan and operating expense obligations. Because there is no legal basis for the Court to do so, this request is denied.

Lender does not object to the writs remaining outstanding as long as they are declared to be junior to Lender's rights. Accordingly, the Court declares that Lender holds a priority status and Navient's writs are junior to Lender's rights. Therefore, the Motion to Quash is Granted in part.

Finally, Navient has reason to believe that its rights as a lien creditor are being impaired. Navient may use post-judgment discovery tools to determine whether its rights are being impaired. Navient does not need leave to engage in such discovery.

## II.    *Factual Background*

### A.    *Navient obtains a judgment against BPG.*[1]

BPG owns the commercial property known as Iron Hill Corporate Center (the "Property"), located in New Castle County, Delaware.[2] Navient was a tenant at the Property pursuant to a November 20, 2012 lease (the "Lease") with BPG.[3] Pursuant to the terms of the Lease, Navient was responsible for maintenance, repair, and replacement of certain Building Systems.[4] Such costs were to be amortized over the useful life of the system. Navient was to "receive an amount from [BPG] at the expiration . . . of the Lease equal to the then-remaining unamortized cost of such Replacement Item …."[5]

The Lease expired on February 29, 2020 and Navient vacated the premises.[6] Navient demanded $503,882.72 from BPG for the unamortized cost of the cooling tower Navient replaced in 2019.[7] When BPG failed to pay, Navient instituted this action. BPG asserted a counterclaim, alleging breach of the Lease based on Navient's alleged failure to maintain other components of the leased space.[8]

---

[1] A detailed recitation of the facts is set forth in this Court's post-trial opinion in *Navient Solutions, LLC v. BPG Office Partners XIII Iron Hill LLC*, 2023 WL 3120644 (Del. Super. Apr. 27, 2023). The factual background in this decision will be limited to facts relevant to the pending motion.
[2] *Id.*, at *1.
[3] *Id.*
[4] *Id.*, at *2.
[5] *Id.*, at *4.
[6] *Id.*
[7] *Id.*
[8] Specifically: (1) a transformer, (2) heat pumps, (3) rooftop fresh air units, and (4) elevators. *Id.*, at *4-8.

4

A three-day bench trial was held in May 2022. Pre-trial, BPG conceded that it owed Navient the amount demanded for the unamortized cost of a cooling tower. Thus, the trial was to resolve BPG's counterclaim and any offset.[9]

On April 27, 2023, the Court issued its Post-Trial Memorandum Opinion finding for BPG on two of the four asserted breaches.[10] The Court offset the amount owed to BPG ($79,650) and entered Final Judgment on May 9, 2023 in favor of Navient in the amount of $424,172.72, plus interest and attorneys' fees for a total of $839,034.60 (the "Final Judgment").[11] Navient's Final Judgment automatically placed a lien on the Property.[12]

**B.** *Navient garnishes rents at the Property.*

Navient conducted discovery in aid of execution on its judgment. On August 30, 2023, it issued praecipes for writs of attachment *fieri facias* for service on nineteen of the then-current tenants at the Property to garnish the rent owed to BPG.[13] The writs issued on September 7, 2023[14] and thirteen tenant-garnishees were served on September 19, 2023 and two more were served on November 1, 2023.[15]

---

[9] *Id.*, at *8.
[10] *Id.*, at *17.
[11] D.I. 67.
[12] *See* 10 *Del. C.* § 4701, *et seq.*
[13] D.I. 71-89.
[14] D.I. 90-107.
[15] DI. 110-128; 146-147. The garnishees' time to respond to the writs has been extended until resolution of the motion to quash.

C.    *BPG and Lender enter into the Loan Documents.*

In October 2017, pursuant to a Loan Agreement, Promissory Note, Mortgage, Assignment of Leases and Rents, and Security Agreement and Fixture Filing (collectively and as amended, the "Loan Documents"), BPG granted a mortgage on the Property and an assignment of rents, among other things, to Lender.[16] The Loan Documents granted BPG a license in the rents, which would automatically be revoked upon an Event of Default.[17] On October 18, 2017, the relevant Loan Documents were filed in the New Castle County Recorder's Office and a UCC Financing Statement was filed.

Section 8.1 of the Loan Agreement provides an "Event of Default" occurs, relevant here, when "(h) Borrower breaches any covenant contained in Sections … 5.22, … [or] 5.27 …."[18]

Section 5.22 provides:

> **Indebtedness**. Borrower shall not directly or indirectly create, incur or assume any indebtedness other than the (i) Debt and (ii) unsecured trade payables incurred in the ordinary course of business relating to the ownership and operation of the Property . . . that (A) are not evidenced by a note, (B) do not exceed, at any time, a maximum aggregate amount of 1% of the original amount of the Principal and (C) are paid within sixty (60) days of the date incurred to the extent sufficient cash flow exists to pay the same (collectively, ***Permitted Indebtedness***)….[19]

---

[16] D.I. 133, Exs. 1-3.
[17] D.I. 133, Ex. 3 (Loan Agreement), § 2.(a).
[18] Loan Agreement, § 8.1.
[19] *Id.*, § 5.22 (emphasis in original).

6

"Indebtedness" is not defined in the Loan Agreement.

Section 5.27 provides:

> **Liens**. Without Lender's prior written consent, Borrower shall not create, incur, assume, permit or suffer to exist any Lien on all or any portion of the Property . . . , except Liens in favor of Lender and Permitted Encumbrances,[20] unless such Lien is bonded, insured over with title insurance, discharged or otherwise removed in accordance with Delaware law within 60 days after the earlier of (i) Borrower first receives notice of such Lien or (ii) the date the lien is filed.[21]

The term "Lien" is defined in the Loan Agreement as:

> any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, easement, restrictive covenant, preference, assignment, security interest or any other encumbrance, charge or transfer of . . . , on or affecting all or any part of the Property . . . , including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances constituting a lien against real property.[22]

Upon the occurrence of an Event of Default, Section 8.2.1 of the Loan Agreement provides that "Lender *may take such action*, without notice or demand, that Lender deems advisable to protect and enforce its rights against [BPG] and in and to the Property; including declaring the Debt to be immediately due and payable … without notice or demand…"[23]

---

[20] "Permitted Encumbrances" is defined to include liens "as Lender approves in writing in Lender's reasonable discretion." Loan Agreement, § 1.1.

[21] *Id.*, § 5.27 (emphasis in original).

[22] *Id.*, § 1.1.

[23] *Id.*, § 8.2.1 (emphasis added).

Section 8.2.2 describes the rights and remedies available to Lender upon an

Event of Default:

> Upon the occurrence of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under the Loan Documents or at law or in equity *may be exercised* by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared, or be automatically, due and payable, and *whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents*. Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order *as Lender may determine in its discretion*, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth in the Loan Documents…. (emphasis added).[24]

Under Section 8.2.4, delay or failure to exercise a right does not constitute a

waiver:

> *No delay or omission to exercise any remedy, right or power accruing upon an Event of Default, or the granting of any indulgence or compromise by Lender shall impair any such remedy, right or power hereunder or be construed as a waiver thereof*, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one . . . Event of Default shall not be construed to be a waiver of any subsequent … Event of Default or to impair any remedy, right or power consequent thereon….[25]

---

[24] *Id.*, § 8.2.2 (emphasis added).
[25] *Id.*, § 8.2.4 (emphasis added).

**D.** *Lender declares a default and accelerates the loan.*

Lender was aware of the Navient Lease and the underlying litigation between Navient and BPG.[26] The July 2020 amendment to the Loan Agreement included a definition of "Navient Lawsuit," which described this litigation. There were also communications between BPG and Lender relating to BPG pursing the litigation and a potential "handoff" of the Property to Lender. Later amendments also referenced this action.

Despite being aware of the litigation, Lender took no action at the time the Final Judgment was entered. Rather, it waited until September 11, 2023 (after the writs were issued and the day before it moved to intervene), to send a notice of default to BPG.[27] Lender notified BPG that because of the Navient judgment, BPG "has (i) incurred indebtedness other than the Debt or unsecured trade payables and (ii) permitted a judgment lien to exist on the Property without Lender's prior written consent."[28] Therefore, Lender accelerated the debt owed under the Note and demanded "immediate payment, in full, of all amounts owed under the Note and other Loan Documents."[29] Lender also expressly revoked BPG's license to "deal with and enjoy the Rents."[30]

---

[26] The Navient Lease is specifically defined in the Loan Documents and referenced throughout.
[27] D.I. 162.
[28] D.I. 162, p. 2.
[29] *Id.*
[30] *Id.*

**E.    *Lender moves to intervene and files the Motion to Quash.***

After the writs were issued, Lender moved to intervene in this action on September 12, 2023, which was granted on October 3, 2023.[31]  Lender filed the Motion to Quash on October 3, 2023,[32] asserting that it held a first priority lien on the Property and in the rents, and therefore, Navient's subsequent writs of garnishment should be quashed.

After the Motion to Quash was fully briefed, the Court held oral argument on November 2, 2023,[33] during which the Court requested supplemental briefing.  The Court permitted Navient to conduct limited document discovery related to an alleged Event of Default under the Loan Agreement.  Following receipt of the parties' supplemental briefing, the Court held a second hearing on January 24, 2024.[34]

## III.    *The Parties' Contentions*

While there are many disputes between Navient and Lender, some points are not in dispute.[35]  There is no dispute that: (i) Lender has a perfected lien on the Property and in the rents; (ii) Lender's lien is prior in time to service of the writs of garnishment; (iii) the Loan Documents between BPG and Lender are valid and enforceable; (iv) the writs of garnishment were issued before Lender declared a

---

[31] D.I. 108, 132.
[32] D.I. 133.
[33] D.I. 145.
[34] D.I. 165.
[35] BPG has taken no position on the Motion to Quash.

default and accelerated the Note; and, (v) the writs of garnishment were properly issued and served.

Relying on *System Soft Technologies, L.L.C. v. Artemis Technologies, Inc.*, Lender argues that because it has a valid, prior perfected lien on the Property and in the rents, the rents cannot be subject to garnishment.[36] Thus, it asserts that the writs of garnishment should be quashed.

Navient first challenges whether an Event of Default occurred under the Loan Documents because "judgment" is not used in any of the Loan Documents and so it is not identified as an Event of Default. Thus, Navient says, it is unclear whether the Final Judgment triggered a default.

Next, Navient asserts that because the Lease is defined in the Loan Documents, and referenced throughout, Lender consented to the terms of the Lease, including the obligation to reimburse Navient for the remaining unamortized cost of replaced systems. Therefore, Lender consented the reimbursement and it is either a Permitted Encumbrance (under § 5.27) or Permitted Indebtedness (under § 5.22) as a trade payable.

---

[36] Lender initially challenged Navient's standing to contest Lender's declaration of an Event of Default and acceleration of the loan, as Navient is not a party to the Loan Documents or a third-party beneficiary. However, Navient is not mounting such a challenge and Lender conceded that Navient has standing to challenge Lender's arguments in support of the Motion to Quash. Accordingly, the Court need not address the standing arguments.

Navient, relying on *American Home Assurance Co. v. Weaver Aggregate Transportation, Inc.*, *S.E.I.U. Local No. 4 Pension Fund v. Pinnacle Health Care of Berwyn LLC*, and *One CW, LLC v. Cartridge World N. Am, LLC,* asserts that even if a default occurred, Lender must take some remedial steps to enforce its rights in order to defeat the writs. Navient points to the fact that "Lender took no action to declare a default until months after the judgment was entered and only after it learned of the writs."[37] This, according to Navient, is not sufficient to preserve Lender's senior status and Navient may properly garnish the rents.

Navient also argues that the Property is still being operated as a going concern and that the rents being collected are sufficient to cover BPG's monthly loan obligation and operating expenses. Therefore, if the Court determines that Lender properly declared a default, Navient asks that the writs be quashed only to the extent necessary to pay the loan and related expenses, thereby leaving the remaining monthly proceeds to be applied to the Final Judgment.[38]

Finally, Navient believes that unsecured creditors are being paid from the rents in violation of its rights as a lien creditor. Therefore, it requests leave to take additional discovery.

---

[37] D.I. 158, p. 12.
[38] *Id.*

**IV.** *Analysis*

    **A.** *Did an Event of Default occur?*

        **1.** *Was the Final Judgment a Permitted Indebtedness?*

Under the Loan Agreement, an Event of Default occurs when BPG incurs "any indebtedness" other than, relevant here, "unsecured trade payables incurred in the ordinary course of business relating to the ownership and operation of the Property" and which "are paid within sixty (60) days of the date incurred to the extent sufficient cash flow exists to pay the same ([a] '***Permitted Indebtedness***')."[39] Navient questions whether a "judgment" is an "indebtedness" as neither term is defined in the Loan Documents. In the alternative, it argues that the Final Judgment was a trade payable which was not paid within 60 days because BPG did not have sufficient cash flow to satisfy the Final Judgment and therefore, it constitutes a Permitted Indebtedness and thus, was not an Event of Default.[40]

"Indebtedness" is not defined in the Loan Agreement. "Judgment" is neither defined nor used in the Loan Agreement. A term that is not otherwise defined is to be given its ordinary meaning.[41] "Indebtedness" means "1. the condition of being

---

[39] Loan Agreement, § 5.22.

[40] Navient bases the lack of sufficient funds on the BPG's disclosure that the rents are its only cash flow, and the monthly collections are generally around $400,000. BPG also disclosed that its monthly loan payment is approximately $120,000 and monthly operating expenses are approximately $200,000.

[41] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006).

indebted. 2. something (such as an amount of money) that is owed."[42]  Indebted means "owing money."[43]  "Judgment" means "an obligation (such as a debt) created by the decree of a court.[44]  Thus, a judgment (owing a debt) falls within the plain meaning of "indebtedness."

"Trade payable" is also not defined in the Loan Agreement.  A trade payable commonly means an expense a business incurs for the purchase of goods or services from a trade creditor.[45]  In contrast, a capital expense is an expense made by a business that provides a long-term benefit.[46]  The Final Judgment arises out of an obligation to reimburse Navient for the replacement of a Building System, *i.e.*, a cooling tower.  Navient was not a trade creditor.  The expense reimbursement does not fall within the category of a trade payable, and thus, the Final Judgment is not a Permitted Indebtedness.

Because the Final Judgment was not a Permitted Indebtedness, it was an indebtedness incurred in violation of Section 5.22 of the Loan Agreement.

### 2.    *Was the Final Judgment a Permitted Encumbrance under Section 5.27?*

---

[42] https://www.merriam-webster.com/dictionary/indebtedness.
[43] https://www.merriam-webster.com/dictionary/indebted.
[44] https://www.merriam-webster.com/dictionary/judgment.
[45] *See In re Nutritional Sourcing Corp.* 398 B.R. 816, 826-27 (D. Del. Bankr. 2008) (recognizing that "trade creditor" is so commonplace that court define it similarly to mean someone who provides goods or services in the ordinary course of business).
[46] S*ee* https://www.merriam-webster.com/dictionary/expense#legalDictionary.

14

Under the Loan Agreement, an Event of Default also occurs when a Lien is imposed on the Property without Lender's prior written consent, unless such Lien is discharged or removed within 60 days "after the earlier of (i) Borrower first receives notice of such Lien or (ii) the date the lien is filed."[47] Here, upon entry of the Final Judgment, a lien automatically attached to the Property. There is no dispute that this lien was not satisfied within 60 days.[48]

Even if the Final Judgment alone did not constitute an Event of Default (as a Permitted Indebtedness), the automatic lien on the Property which remained unsatisfied for 60 days falls squarely within Section 5.27 of the Loan Agreement ("Liens" defined to include liens (statutory or otherwise)).[49] Thus, an Event of Default occurred by July 9, 2023.

Navient makes a facially appealing argument that because Lender approved the form of lease and clearly knew of the Navient Lease and the litigation, Lender should be deemed to have consented to BPG's obligation to reimburse Navient, and as a result, consented to the Final Judgment. Thus, Section 5.27 was not triggered.[50]

---

[47] Loan Agreement, §§ 8.1, 5.22.
[48] In the circumstances here, the date BPG received notice of the lien and the lien being "filed" are the same date as BPG knew the Final Judgment was entered on May 9, 2023 and the lien automatically attached at that time.
[49] Loan Agreement, § 1.1.
[50] Loan Agreement, § 5.27 ("Without Lender's prior written consent, Borrower shall not . . . permit or suffer to exist any Lien ….").

Not only was the Navient Lease defined in the Loan Agreement, Lender was fully aware of what was at stake in the litigation and the potential outcomes. Schedule 3 to the Third Amendment to the Loan Agreement describes this litigation in detail, including the amount of Navient's claim and BPG's counterclaim.[51] Apparently, the hope was that the counterclaim would be successful, which would have eliminated the amount owed to Navient by an offset.[52]

Navient has not had a full opportunity to explore through discovery whether Lender's actions prior to entry of the Final Judgment amounted to consent. However, assuming that the evidence could be developed to support the conclusion that Lender was deemed to have consented to the Final Judgment when it was entered, on September 11, 2023, Lender declared a default under Section 5.22 (due to an indebtedness being incurred which was not a Permitted Indebtedness) and Section 5.27 (due to entry of the Final Judgment and the resulting lien on the Property).[53] Lender also accelerated the loan and expressly revoked BPG's license to the rents.[54] Lender had discretion to determine when and how to exercise its rights and remedies. Thus, even if the Lender previously consented to the judgment and lien, it is clear that as of September 11, 2023, it no longer consented. This

---

[51] D.I. 158, Ex. D, Schedule 3.
[52] *See, Id.*, Ex. E (BPG covenanting to continue to use its best efforts to pursue the counterclaim).
[53] D.I. 162.
[54] *Id.*

declaration of default occurred before the writs were served on September 19, 2023 (or later). Thus, the automatic lien on the Property resulted in an Event of Default either as of July 9 or as of the declaration of default on September 11, 2023.

## B. *Was Lender required to do more?*

### 1. *Delaware garnishment law*

The starting point to determine the relative rights of Lender and Navient is to understand the nature and rights under Delaware garnishment law. "Garnishment is a legal device that enables 'a judgment creditor to satisfy an underlying judgment by reaching assets, property, [or] money … of a judgment debtor in the possession of, or under the control of, a third person or party, called a garnishee.'"[55] A garnishment is initiated by the issuance of a writ of *fieri facias* (also known as a writ of *fi. fa.*). The writ is served on the person or entity in possession of the defendant's property. When the writ is served, the effect "is to bind the property of the defendant so attached, from the time of laying the attachment. The property so attached is bound in the hands of the garnishee until answer is made by him…."[56]

> A garnishment differs in
>
> no essential respect from a levy excepting that the plaintiff does not acquire a clear and full lien upon the specific property in the garnishee's possession, but only such a lien or claim as gives him the right to hold

---

[55] *J.G. Wentworth SSC Ltd. P'ship v. Crawford*, 2002 WL 449701, at *1 (Del. Super. Mar. 21, 2002) (citing 30 AM.Jur.2d *Executions, Etc.* § 644 (1994)).

[56] 2 Woolley, *Delaware Practice* § 1165 (1985 version).

> the garnishee personally liable for it ... and to restrain the garnishee from paying the debt to the defendant.[57]

The judgment creditor, however, gains no more rights in the property attached than that of the judgment debtor.  Indeed:

> The right of such creditor to recover from the garnishee depends upon the subsisting rights between the garnishee and the debtor in the attachment; and the test of the garnishee's liability is that he has funds, property or credits in his hands belonging to the debtor, for which the latter would have a right to sue.  The garnishee stands in every respect in the same position as if the suit had been brought by his own creditor.  When a debt is due from a garnishee to a judgment debtor by virtue of an agreement existing between them, the garnishee is entitled to avail himself of all the defenses that could be made against the party to whom the debt is owing and with whom the contract was made.[58]

> Thus, if the judgment debtor cannot compel the third party "to pay money …

to him in an action at law, his creditor has no greater claim by way of garnishment

against that third party."[59]

## 2.     *Relevant Article 9 provisions and Delaware policy*

Under Article 9, generally the first creditor to perfect its interest in the collateral has priority over other secured creditors.[60]  A judgment creditor is not a secured creditor under Article 9, but rather, is a "lien creditor."[61]  The priority of a secured creditor and a lien creditor is addressed in Section 9-317: "A security interest

---

[57] *Id.*, § 1189.

[58] *Id.*, § 1190.

[59] *Wilm. Trust Co. v. Barron*, 470 A.2d 257, 264 (Del. 1983).

[60] *See* 6 *Del. C.* § 9-322(a)(1); *see also WSFS v. Chillibilly's, Inc.*, 2005 WL 730060, at *4 (Del. Super. Mar. 30, 2005).

[61] 6 *Del. C.* § 9-102(a)(52) (defining a lien creditor as "a creditor that has acquired a lien on the property involved by attachment, levy, or the like….").

… is subordinate to the rights of: … a person that becomes a lien creditor before … the time: (A) the security interest … is perfected."[62] Thus, a prior perfected secured creditor has priority over a later lien creditor.

Section 9-601 provides that: "[a]fter default, a secured party has the rights provided in this part and, … *those provided by agreement of the parties*. A secured party: (1) *may* reduce a claim to judgment, foreclose, or otherwise enforce the claim [or] security interest, … by any available judicial procedure."[63] Official Comment 3 to Section 9-601 states: "This Article does not determine whether a secured party's post-default conduct can constitute a waiver of default in the face of an agreement stating that such conduct shall not constitute a waiver. Rather, it continues to leave to the parties' agreement, as supplemented by law other than this Article, the determination whether a default has occurred or has been waived."[64]

Finally, Section 9-610 addresses disposition of collateral after default. "After default, a secured party *may* sell, lease, license, or otherwise dispose of any or all of the collateral…."[65] Official Comment 5 to Section 9-610 provides: "the disposition [of collateral] by a junior [secured creditor does] not cut off a senior [creditor's] security interest… [Rather, the] senior security interest is entitled, by virtue of its

---

[62] *Id.*, § 9-317(a)(2).
[63] *Id.*, § 9-601(a) (emphasis added).
[64] *Id.*, § 9-601, cmt. 3.
[65] *Id.*, § 9-610(a) (emphasis added).

priority, to take possession of collateral from the junior secured party and conduct its own disposition, provided that the senior enjoys the right to take possession of the collateral from the debtor."[66]

> Delaware has a strong public policy of freedom of contract, which
>
> enables sophisticated counterparties to contract as they wish and her courts are loath to disturb bilaterally-negotiated terms. Pro-contractarian, Delaware law in general recognizes that the value of contracts is maximized by enforcing them as written [and that] little value can come of a promise that can be avoided upon the remorse of the maker thereof. Indeed, Delaware law promotes voluntary business arrangements as a matter of fundamental public policy.[67]

The policy of the UCC is to "simplify, clarify, and modernize the law governing commercial transactions [and to] permit the continued expansion of commercial practices through custom, usage, and agreement of the parties."[68] Delaware has recognized that the UCC enables parties to craft "contractual arrangements that generate wealth and the investment of capital in commercial enterprise because parties are able to rely on a clear and predictable set of rules to govern their transactions."[69]

---

[66] *Id.*, § 9-610, cmt. 5.
[67] *Unbound Partners Ltd. P'ship v. Invoy Holdings Inc.*, 251 A.3d 1016, 1031–32 (Del. Super. 2021) (cleaned up).
[68] 6 *Del. C.* § 1-103.
[69] *Off. Comm. of Unsecured Creditors of Motors Liquidation Co. v. JPMorgan Chase Bank, N.A.*, 103 A.3d 1010, 1017 (Del. 2014).

### 3. *Cases relied upon by the parties.*

Navient relies upon:

***American Home Assurance Co. v. Weaver Aggregate Transport, Inc*.**[70] After plaintiff obtained a judgment against Weaver Aggregate Transport, Inc. ("Weaver"),[71] Weaver entered into loan agreements with The Farmers and Mechanics Bank (the "Bank").[72] Five months later, plaintiff served writs of garnishment on the Bank. The Bank moved to quash asserting that it had a right of setoff because, relevant here, (1) it had a perfected security interest in Weaver's bank account; and (2) that the loan was in default upon service of the writs on the Bank.[73]

The court found that the Bank had a perfected security interest in Weaver's deposit account.[74] However, under Illinois law a bank with a perfected security interest must "show that it declared the loan in default and took affirmative steps thereafter to enforce its rights."[75]

The court found that the Bank had not established that the loans were in default *at the time* the writs were served. The evidence showed that as of the date the writs were served, there had been no monetary defaults and the Bank did not declare a non-monetary default until *after* the writs were served. The court rejected

---

[70] 84 F.Supp.3d 1314 (M.D. Fla. 2015).
[71] *Id.,* at 1321.
[72] *Id.,* at 1318.
[73] *Id.*
[74] *Id.,* at 1320.
[75] *Id.*

the Bank's argument that service of the writs effected a default because the Bank did not have a right of setoff (because it had not declared a default) just prior to the moment the writs were served and therefore, the writs "primed" the Bank's right of setoff.[76]

Finally, the court addressed whether the Bank's prior perfected security interest trumped the writs, despite no default occurring before the writs were served. Relying primarily on *S.E.I.U.* and *One CW* the court ruled that the loan agreement did not give the Bank the right to seize control of the collateral until a default had occurred.[77] Relying on *Frierson v. United Farm Agency, Inc.*, the court ruled that the Bank's security interest did not give it priority over the judgment creditor because the Bank had not taken steps to enforce its rights under its loan documents or the UCC prior to service of the writs.[78] Therefore, the court held that the Bank did not have a right of setoff.

***S.E.I.U. Local No. 4 Pension Fund v. Pinnacle Health Care of Berwyn LLC.***[79] Plaintiff obtained a judgment against Pinnacle Health Care of Berwyn LLC ("Pinnacle"), resulting in a judgment lien. Premier Bancorp ("Premier") held a prior perfected security interest in Pinnacle's assets. At issue were funds owed to Pinnacle

---

[76] *Id.*, at 1324.
[77] *Id.*, at 1325-26.
[78] *Id.*, at 1326.
[79] 560 F.Supp.2d 647 (N.D. Ill. 2008).

from a third-party, which Premier asserted were covered by its security interest. Under the security agreement, Premier could exercise rights over the collateral only after a default.[80] Relying on *Frierson*, the court ruled that although Premier had a prior perfected security interest (and Pinnacle technically defaulted), because Premier did not declare the loan in default or follow the procedures required by the security agreement to enforce its UCC and contractual rights, it did not have a *present right to the funds*, and accordingly, the court released the funds to plaintiff.[81]

*One CW, LLC v. Cartridge World North America, LLC.*[82] Plaintiff obtained a judgment against Cartridge World Midwest, LLC ("Midwest") and served a writ of garnishment on Signature Bank, where Midwest had funds on deposit.[83] Signature Bank had a prior perfected security interest in Midwest assets, including the funds in the bank account.[84] The loan documents contained the same provisions as the security agreement in *S.E.I.U.*[85] On the day the writ was served, Signature

---

[80] *Id.*, at 650 ("Until default and except as otherwise provided below with respect to accounts, [Pinnacle] may have possession" of the collateral. "If an Event of Default occurs under this Agreement, at any time thereafter, [Premier] shall have all the rights of a secured party under the Illinois Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies: [list includes acceleration of the debt, obtain deficiency judgment, among others].").

[81] *Id.*, at 651.

[82] 661 F.Supp.2d 931 (N.D. Ill. 2009).

[83] *Id.*, at 933.

[84] *Id.*

[85] *Id.*, at 934.

Bank declared a default, but took no action under the documents to enforce its rights.[86]

Following the reasoning in *S.E.I.U.* and *Frierson*, the court ruled that Signature Bank had *no present right to possess the funds* at issue and because it failed to exercise its rights, it had no grounds to object to the release of the funds to plaintiff.

***Frierson v. United Farm Agency, Inc*.**[87] Merchants bank held a perfected possessory security interest in United Farm Agency, Inc.'s ("UFA") bank account at Merchants and a security interest in UFA's funds held in two other banks.[88] After obtaining a judgment against UFA, plaintiff served a writ of garnishment on the three banks. Merchants moved to quash, asserting that it had a right to setoff (with respect its own account) pursuant to the loan agreement with UFA, and that it held a prior perfected security interest in the funds in the accounts at the other two banks.[89] Under Missouri law, "a bank need not take steps to effect a setoff prior to garnishment, but only must show that a default existed."[90]

The loan agreement between Merchants and UFA provided that an event of default occurs when UFA fails to discharge a judgment within thirty days of its entry.

---

[86] *Id.*, at 935.
[87] 868 F.2d 302 (8th Cir. 1989).
[88] *Id.*, at 303.
[89] *Id.*
[90] *Id.* at 304 ("[A] bank cannot … defeat a garnishment on the ground that the depositor owes the bank money on a note not yet due.") (citation omitted).

This thirty-day period expired long before the writs were served.[91] Accordingly, on appeal, the court ruled that Merchants had the right to setoff before the writ attached and therefore, the writ served on Merchants should have been quashed.[92]

The court next determined the impact of Merchants' prior perfected security interest under Article 9 in the funds in the other two banks. Agreeing with the district court, the Eight Circuit said:

> If a secured creditor with a security interest over all the debtor's property is permitted to rely on a default, whether technical or not, to prevent another creditor from executing on the debtor's property, while treating the loan as not in default when dealing with the debtor and others, severe inequities would result. * * * Such an approach would be against both the spirit and the letter of the Uniform Commercial Code.[93]

> ***

> Merchants cannot refuse to exercise its rights under the security agreement, thereby maintaining [the debtor] as a going concern, while it impairs the status of other creditors by preventing them from exercising valid liens. Allowing Merchants to [refuse to enforce its rights and prevent other creditors with valid liens from exercising their rights] would fly in the face of all Article 9, which is premised on the debtor's ability to exercise rights in the property…. Article 9 requires that [plaintiff] take the remaining funds subject to Merchants' security interest if the bank refuses to exercise its remedies under the code…. Merchants' security interest in the funds will continue, and Merchants can trace and recapture when it chooses to declare the loan in default and accelerate the debt.[94]

---

[91] *Id.*
[92] *Id.*
[93] *Id.,* at 304-05.
[94] *Id.,* at 305.

The appeals court remanded, directing the lower court to quash the writ served on Merchants. The writs served on the other banks were found to be valid and thus, not quashed. However, funds plaintiff received from these writs were taken "*subject to Merchants' security interest.*"[95]

Lender relies upon:

***System Soft Technologies, L.L.C. v. Artemis Technologies, Inc***.[96] After obtaining a judgment against Artemis Technologies, Inc. ("Artemis"), plaintiff served writs of garnishment on Artemis' customers.[97] Summit Community Bank ("Summit") held a prior perfected security interest in Artemis' assets and moved to quash the writs. Prior to service of the writs, Summit had declared a default and accelerated the loans.[98] Summit also entered into a forbearance agreement with Artemis, pursuant to which Artemis would continue to operate and make payments on the amount owed to Summit.[99] After the lower court quashed the writs, plaintiff appealed.

On appeal, plaintiff did not dispute Summit's prior perfected security interest, but argued that Summit was required to foreclose on Artemis' assets in order to prevent plaintiff from collecting on its debt.[100] The court noted that under Article 9,

---

[95] *Id.* (emphasis added)
[96] 301 Mich. App. 642 (Mich. Ct. App. 2013).
[97] *Id.*, at 646.
[98] *Id.*
[99] *Id.,* at 652-53.
[100] *Id.*, at 650.

a secured party "[*m*]*ay* reduce a claim to judgment, foreclose, or otherwise enforce the claim, security interest, or agricultural lien by any available judicial procedure."[101] "A secured party '[m]ay' also '[n]otify an account debtor or other person obligated on collateral to make payment or otherwise render performance to or for the benefit of the secured party.'"[102] With these permissive provisions and because there is nothing in the statute that *requires* a secured party to foreclose to enforce its rights, the court rejected plaintiff's argument and quashed the writs.[103]

### 4.    *Discussion*

As a judgment creditor serving a writ of garnishment on the Property's tenants, Navient did not gain a clean and full lien in the rents. Rather, it gained the right to restrain those parties from disposing of the property and stepped into the shoes of BPG. That is, Navient gained no greater rights in the rents than BPG possessed on the day the writs were served – September 19, 2023 (or later).

By entry of the Final Judgment and a lien automatically attaching to the Property (which remained unsatisfied for 60 days), an Event of Default occurred.[104] At that moment, BPG's right to possess and use the rents automatically ceased and

---

[101] *Id.*, at 652, (emphasis in original) quoting Mich. Comp. Laws Ann. § 440.9601(1)(a).
[102] *Id.*, quoting MCL §440.9607(1)(a)).
[103] *Id.*, at 652 (emphasis in original).
[104] Even if Lender had originally consented to the entry of the Final Judgment and lien on the Property, it no longer consented as of September 11, 2023. Thus, under either scenario, an Event of Default occurred before September 19, 2023.

Lender had the right to the rents.[105] Because BPG no longer had a right to the rents, Navient could not have a right to the rents, as it could have no greater rights than BPG. Thus, Navient could not compel the garnishees to pay the rents to it. At that point, the Lender held the right.

Pursuant to Section 9-317, Lender, as a prior perfected secured creditor, has priority over Navient, as a subsequent lien creditor. Despite the clear priority set forth in Section 9-317, under *American Home* and the Illinois cases, Navient argues that Lender was required to take remedial action to preserve its priority. Because it did not do so until after the writs were issued, according to Navient, Lender cannot prevent Navient from collecting the rents. This line of case and the "use-it-or-lose-it" theory of a secured party's rights were reviewed more recently in *Legacy Bank v. Fab Tech Drilling Equip., Inc.*[106] and *Davis v. F.W. Fin. Srvs., Inc.*[107]

As noted in *Davis*, *S.E.I.U.* construed the security agreement in that case as imposing three preconditions to the secured creditor's right to its collateral: "that (1) a default occur, (2) the secured party declare a default, and (3) the secured party take 'affirmative steps' to exercise its rights."[108] Thus, according to the *S.E.I.U.* court, if any one of these conditions remain unsatisfied at the time the lien creditor served its

---

[105] *See* Loan Agreement, D.I. 133, Ex. 4, § 2(a),(b).
[106] 566 S.W.3d 922 (Tex. App. 2018).
[107] 317 P.3d 916 (Or. Ct. App. 2013).
[108] *Id.*, at 923.

writ of garnishment, the secured creditor constructively waived its priority rights.[109]

*One CW* and *American Home*, involving the same contractual language as in *S.E.I.U.*, ruled in the same fashion.

The use-it-or-lose-it theory, however, is inconsistent with the UCC. This theory imposes a requirement on the secured party which is not mandated by Article 9. Indeed, Section 9-601 describes the secured creditor's rights after a default which as permissive – a secured creditor "*may* reduce a claim to judgment, foreclose, or otherwise enforce the claim." No action is mandated by this section.

Further, the use-it-or-lose-it theory, which is essentially a constructive waiver, is contrary to the terms of the Loan Agreement. In it, Lender was given discretion whether and when to exercise its rights and remedies after an Event of Default, whether or not Lender "commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies" and no delay or omission in pursuing any remedies will impair such remedies or be "construed as a waiver."[110] Additionally, the parties' rights are expressly preserved by Section 9-601 ("[a]fter default, a secured party has the rights provided in this part and, … *those provided by agreement of the parties*). As Comment 3 makes clear, the parties' agreement will determine whether a waiver occurred. Ignoring the terms of the Loan Agreement to

---

[109] *Id.*
[110] Loan Agreement, §§ 8.2.1, 8.2.2, 8.2.4.

find a waiver is against Delaware policy to enforce parties' agreements as they have negotiated them.[111]

Under the countervailing approach – trace and recapture – "until a secured party declares a default [or a default otherwise occurs] and acts on its right to collateral, a garnishor is entitled to take the collateral; however, in doing so, the garnishor *takes traceable collateral subject to the secured party's interest*."[112] Thus, after a default, where the secured creditor has not taken action with respect to its collateral when the writ of garnishment is served, the lien creditor may collect the funds, but the funds are subject to the secured party's lien.[113] Thus, the secured creditor does not lose its rights.[114]

This approach is consistent with *Frierson*, where the court ruled that the lien creditor could garnish funds in the judgment-debtor's accounts, but those funds were "subject to" the secured creditor's lien.[115] While the Illinois cases and *American Home* relied on *Frierson*, commentators have argued that those court misapplied *Frierson* and misconstrued the security agreement at issue in *S.E.I.U.*.[116] None of the

---

[111] Loan Agreement, § 8.2.4 (Lender's omission to act "shall [not] be construed as a waiver").
[112] *Davis*, 317 P.3d at 924 (emphasis added).
[113] *Id.*
[114] *Legacy Bank*, 566 S.W.3d at 930. This is not to say that a secured party can never waive its rights. To be sure, the terms of the parties' agreement will inform such a determination.
[115] *Frierson*, 868 F.2d at 305.
[116] *See Legacy Bank*, 566 S.W.3d at 929 (citing Miller & Bjerre, 9B HAWKLAND UCC SERIES § 9-317:2 at n.39 (*Davis* "more thoughtfully" reflects the principles of Article 9)); Jeanne L. Schroeder, David Carlson, *Three Against Two: On the Difference Between Property and Contract*

cases relied upon by Navient recognized, as *Frierson* did, that the prior perfected secured creditor's rights attach to the funds, even in the hands of the lien creditor.

For several reasons, the Court finds that the "trace and recapture" approach, as applied in *Davis,*[117] *Legacy Bank*,[118] and *Frierson,* to be consistent with Delaware law and the policies of Article 9.

First, Section 9-601 provides that after a default, a secured creditor *may* exercise its rights. Nothing in this section *requires* the secured creditor to act.

Second, Section 9-610 provides that after a default, the secured creditor *may* dispose of the collateral. Again, this section is permissible. Furthermore, as the Comment makes clear, even if a junior secured creditor disposes of the collateral, the senior secured creditor does not lose its security interest. If a secured creditor's rights are preserved even against a junior secured creditor, why would a later lien creditor be granted any greater rights? The use-it-or-lose-it cases do not address this point.

---

*and the Example of Deposit Accounts in Bankruptcy*, 35 Emory Bank. Dev. J. 417 (2019), at \*447-49.

[117] In *Davis*, after the debtor defaulted, the secured creditor did not take action to recover its collateral. Another creditor obtained a judgment against the debtor and subsequently served writs of garnishment. The lien creditor obtained funds through the garnishment. When the secured creditor later sought to recover its collateral from the lien creditor, it refused to return the funds. The *Davis* court ruled that because the garnishment occurred after a default but before the secured creditor exercised its rights, the funds were properly turned over to the lien creditor, but they were subject to the secured creditor's interest. Despite the secured creditor's delay in exercising its rights, it was entitled to recover the funds from the lien creditor. 317 F.3d at 926.

[118] *Legacy Bank* largely relied on *Davis* and ruled that the secured lender did not waive its rights by not foreclosing on its collateral until after writs of garnishment were served.

Third, the "touchstone" of Article 9 is "[t]he primacy of a prior perfected secured creditor's claim to collateral."[119] The policy of the UCC is to simplify and clarify the law governing commercial transactions and to allow parties to "rely on a clear and predictable set of rules."[120] If a secured creditor is at risk of losing its priority status, it would be forced to foreclose or "take some remedial steps" even when a technical default occurs. There are valid reasons why a secured creditor may not exercise any or all of its rights upon a default. The secured creditor might choose to allow the debtor to continue operating the business in hopes that its financial condition will improve (as occurred in *System Soft*) and the secured creditor will receive a larger return than if it foreclosed on the assets.[121] Forcing the secured party to foreclose or take some action with respect to its collateral would also deprive the secured party of the benefit of its bargain in the bundle of rights it negotiated in the parties' agreement. This is against Delaware policy of freedom of contract and of our courts enforcing commercial contracts as written. The use-it-or-lose-it approach would lead to uncertainty and lack of predictability in commercial transactions.[122] A secured party would have to guess whether it took sufficient action to satisfy a reviewing court that it did not constructively waive its priority status.

---

[119] *Davis*, 317 P.3d at 925.
[120] 6 *Del. C.* § 1-103; *Motors Liquidation*, 103 A.3d at 1017.
[121] *See System Soft Tech.*, 301 Mich. App. 642.
[122] *Motors Liquidation*, 103 A.3d at 1016-17.

Finally, even if the Court were to find *S.E.U.I.* and the use-it-or-lose-it line of cases persuasive, they are factually distinguishable. Unlike those cases, Lender declared a default, accelerated the loan, and revoked BPG's license to the rents, all before the writs were served.

Because Lender has a valid, prior perfected secured lien and a default occurred before the writs of garnishment were served, Lender maintains its priority status and Navient's writs are junior to Lender's rights.

Citing *Hager v. Frantz-Hager*,[123] Navient requests the Court order that the writs be honored with respect to funds in excess of BPG's monthly loan obligation and operating expenses. This request is denied. First, to require such payments would ignore the acceleration of the loan balance. Thus, BPG's current obligations are not limited to the monthly payment it was making before the default. Second, *Hager* does not support such a ruling. In *Hager*, the relevant statute imposed a trust on proceeds from a construction contract only to the extent sufficient to pay the subcontractors. Funds in excess of that amount were not trust funds. After the court determined the amount required to pay the subcontractors, it permitted the excess funds to be paid to pursuant to the writ of garnishment.[124] Here, all of the rents are subject to the Lender's rights.

---

[123] 2014 WL 1614603 (Mich. Ct. App. April 22, 2014).
[124] *Id.*, at *1.

Navient, therefore, sits in second place behind Lender.

### C.  *Additional discovery*

Navient believes that junior unsecured creditors are being paid ahead of Navient.  Lender did not address this issue in its supplemental briefing, but at the second hearing, counsel for Lender relayed his belief that this was not occurring. Navient has post-judgment discovery tools available to it, which can be deployed against BPG and Lender.  Thus, unless and until a protective order is entered, Navient is free to use those tools to determine whether its rights are being impaired and, if appropriate, to file a motion seeking relief.

## V.  Conclusion

Lender has a prior perfected, secured interest in the rents.  It declared the loan in default, accelerated the loan, revoked BPG's license in the rents before Navient's writs were served.  Thus, Navient's valid writs are subordinate to the Lender's position.

IT IS HEREBY DECLARED that Lender's prior, perfected security interest has priority over Navient's garnishment writs.


**IT IS SO ORDERED**.

*/s/Kathleen M. Miller*
Judge Kathleen M. Miller

34